# Jones v. The State.

## Murder.

(Decided April 6, 1915.   68 South. 690.)

1. *Homicide; Evidence; Motive.*—Notwithstanding evidence showing motive is not indispensable in a prosecution for murder, where the evidence tending to connect the defendant with the commission of the crime was wholly circumstantial, it was competent to show the fact that when deceased left home he had money in his possession, and that he exhibited his purse and made statements as to the value of its contents in the presence of the defendant.

2. *Criminal Law; Elements; Intent.*—Criminal intent is an essential element of many character of crimes; intent means the purpose to use particular means to effect the result and accomplish the purpose as distinguished from motive; motive being the power impelling action to a definite result, the reason moving the will and tempting the mind to indulge the criminal intent, which may be of little or no importance when the crime is otherwise clearly proven.

3. *Homicide; Evidence; Indictment.*—Where the indictment alleged that the weapon which was used was unknown to the grand jury, and before any proof was offered showing the character of the weapon with which deceased was killed, the testimony of the wife of deceased that on the night he disappeared she heard loud talking and recognized her husband's voice, and immediately heard the report of a pistol from the same direction and locality, was within the issues and properly admitted.

4. *Trial; Excluding Evidence; Motion.*—Where evidence which was subsequently admitted disproved the theory that the wound was inflicted by a blow on the head with a pistol or pistol shot, the question of its relevancy to the issues made by the subsequent proof could only be presented by motion to exclude it.

[Jones ·v. The State.]

5. *Evidence; Declaration of Defendant.*—To authorize proof of defendant's· declaration, made after the offense with reference to the offense, such declaration need not amount to a confession of guilt, but need only be self-disserving, and of such character that when considered with the other evidence, reasonably affords an inference of guilt.

6. *Same.*—Where a witness had told defendant that a warrant was out for his arrest, defendant's statement to the witness that if they got defendant they would have to do it ·between there and home, as he was going home and was going to leave, was admissible as affording an inference that such declarations were made or prompted by a consciousness of guilt.

7. *Homicide; Conduct of Defendant.*—Evidence as to the conduct of defendant and his failure to reply to the widow of deceased when asked where deceased was, and when charged that he knew where decased was, was admissible.

8. *Witnesses; Cross-Examination.*—Where a witness for defendant on direct examination stated that he went to the place where the body was found, and that the earth under the place where the head rested was discolored, and that there was blood there, it was proper to permit the state on cross-examination to ask whether if the dead body had been left on the ground until it had decomposed, it would not cause a discoloration of the ground, although such witness was not shown to be an expert; the defendant having offered the witness as a non-expert to testify to the discoloration was estopped from objecting to his competency to give testimony of an expert nature concerning such matter.

9. *Homicide; Evidence; Wounds.*—It was competent to show that the head of deceased was severed from the body when it was found.

10. *Appeal and Error; Variance; Presentation Below.*—Where the record does not affirmatively show that the failure to prove venue was brought to the court's attention, the defendant was not entitled to the affirmative charge because thereof, or rather the court will not be put in error for refusing the same. (Cir. Ct. Rule 35.)

11. *Homicide; Requisites; Malice.*—Malice is an essential ingredient of murder, and is generally an inferential fact to be drawn by the jury, unless the evidence is without room for adverse inference that the killing was intentional and was accomplished by a weapon which the law denominates a deadly weapon.

12. *Same; Presumption and Burden of Proof.*—Where a killing results from the intentional use of a weapon which the court may pronounce a deadly weapon as a matter of law, such as a gun or pistol of sufficient calibre and carrying force to produce death, and the evidence which proves the killing does not afford room for an inference rebutting the presumption of malice arising from the use of such weapon, it is incumbent on defendant to rebut that presumption by other evidence, and the presumption is conclusive against him if · he fails to do so.

13. *Same.*—Where the presumption of malice is conclusive against the defendant, no duty devolves on the trial court to instruct on any degree of homicide less than murder.

14. *Same.*—Where the evidence which proves the killing rebuts the presumption of malice, or affords room for an inference tending to rebut such presumption, or where the evidence as to the character of the weapon, the circumstances attending the homicide, and the motive therefor rests in inference, the court should charge on all the degrees of intentional homicide.

15. *Evidence; Motive; Necessity of Proof.*—A failure to prove motive raises no presumption in favor of defendant, since the law does not require proof of motive for a crime, and proof that the accused committed the criminal act, furnishes all the evidence of motive that the law requires.

16. *Charge of Court; Reasonable Doubt.*—Charges which require the jury to be so convinced of the guilt of defendant that they would be willing to act upon the same in matters of highest concern and importance to their own interest, have been repeatedly and consistently condemned.

17. *Same; Reasonable Construction.*—A charge asserting that if there be two reasonable constructions which can be given to the facts proven, one favorable to the defendant and the other unfavorable, it is the duty of the jury to give that which is favorable rather than that which is unfavorable, is argumentative and properly refused.

18. *Same; Accomplices.*—Where a defendant was jointly indicted with another, and a severance had been granted, charges that there should not be a conviction unless the evidence excluded every reasonable hypothesis but that of defendant's guilt, and that if the facts can be reconciled with the theory that some other person committed the act, the guilt of defendant is not shown, etc., were properly refused where there was evidence tending to show that defendant was an accomplice of some other person who might have committed the act by actually inflicting the blow.

19. *Homicide; Intent; Manslaughter.*—There must be either a positive intention to kill or an act of violence from which ordinarily death or great bodily harm may result, in the usual course of events, and it is not necessary that the perpetrator intended or willed the death of deceased, to constitute manslaughter in the first degree.

20. *Charge of Court; Incomplete.*—A charge incomplete in itself may be properly refused.

21. *Same; Assuming Fact.*—A charge asserting that even if the death of deceased is caused by the defendant, he could not be convicted of murder in either degree, or of manslaughter in the first degree, unless the jury believed that such act was inflicted with the intent to kill, or unless defendant intended to do an act of violence from which ordinarily death or great bodily harm might have resulted, assumed that the act resulting in death was an act of violence, or an unlawful act, without so stating it, and was properly refused.

APPEAL from Geneva Circuit Court.

Heard before Hon. H. A. PEARCE.

Rudolph Jones, alias, etc., was convicted of murder in the second degree, and he appeals. Reversed and remanded.

The appellant was jointly indicted with Jesse Palmore at the spring term, 1914, of the circuit court of Geneva county for murder in the first degree; the indictment being in the following words: "The grand jury of this county charge that, before the finding of this indictment, Rudolph Jones, alias Rodolph Jones and Jesse Palmore, unlawfully and with malice aforethought killed Tully Etheridge by striking him with some weapon the character of which was to the grand jury unknown, against the peace and dignity of the state of Alabama."

The appellant was granted a severance, and was tried and convicted of murder in the second degree, and appeals.

The evidence offered by the state showed and tended to show that the deceased, in company with Cleve Ezell, on the afternoon of November 15, 1913, left his home about sundown, traveling in a buggy drawn by a mule, and when he left home he had on his person two purses, one containing $19.81 in money and some receipts, and the other $4 in silver; that the deceased never returned to his home again, but 24 days thereafter a portion of his decomposed body was found in the woods in the same community, with the flesh stripped from the bones of the body, and the head dissevered. On the right temple was a wound about the size of the finger's end, which penetrated the skin, and under this wound the right temporal bone showed a fracture one and one-half inches long and one inch wide. Dr. Chapman, the physician who made a post mortem examination of the head, testified that when he raised the skin from the skull bone the fractured portion of the bone dropped in, leaving

an opening in the skull of the dimensions above indicated; that this wound was inflicted by the use of a weapon of some kind; that the results found on the head could have been produced with an ax, hatchet, or club, "lightwood knot," but that it could not have been caused by striking with the fist. The evidence was without material conflict that after deceased and Ezell left the home of the deceased they went immediately to Hardy Hornsby's, a short distance from the home of the deceased, and here Ezell left the deceased, who, after remaining at Hornsby's for only a short time, proceeded to the home of Horace Thomas, reaching this place about 7 o'clock. The deceased and Thomas then made a trip through the community trying to sell some liquors which the deceased had in the buggy. They remained together until about 8 o'clock, when they separated, and Thomas returned to his home, arriving there about 8 o'clock, or a few minutes late. The deceased went on to S. D. Snellgrove's, where there was a social gathering of young people. Here the deceased, in the presence of the defendant, Jesse Palmore, and others, exhibited and opened the large purse so as to show that it contained money, but not sufficiently to disclose the quantity it contained; and, according to two of the state's witnesses, stated, "I would not let the old man have it; I would not take $100 for it;" and, according to another, deceased said he had "$300 in it," and that he "would not let" his "daddy have it."

The crowd that had gathered at Snellgrove's broke up about 10 o'clock, and defendant and deceased hitched the mule deceased was driving to the buggy and left Snellgrove's place together in the buggy. The deceased was next seen by Walker Peterson at about 15 minutes after 10 o'clock, in front of Palmore's house, on a set-

tlement road leading to "Bullock's Mill," in company
with the defendant, Jesse Palmore, Frank Palmore, and
Charlie McGowen, all in the one buggy together, ex-
cept Frank Palmore, going in the direction of Palmore's
house. This is the last time, according to the state's
theory, that deceased was ever seen alive. The body was
found in a thick wood about one mile from Palmore's
house, and near by where the body was found the small
purse carried by deceased when he left home was found
with its contents gone. The other purse was found two
weeks after the deceased disappeared in the grass on the
side of the Enterprise and Geneva road, containing
nothing but the receipts. The mule driven by deceased
was found in Palmore's horse lot, near where deceased
was last seen alive, according to the state's theory, the
next day after the deceased disappeared.

There was evidence tending to show that soon after
the defendant and deceased left Snellgrove's, and pos-
sibly after these parties had passed Peterson's, two pis-
tol shots were heard in the direction of and near the
place where they were, and about 11 o'clock the wit-
nesses Enoch Lighter and Marshall Darby passed the
defendant and Frank Palmore, who were standing on
the side of the road in about 200 yards of Palmore's
place, and near where this shooting occurred, and Light-
er's mule became frightened and jumped to the right
of the road, and here, according to the state's witnesses,
the following conversation occurred between Lighter
and defendant: "Rudolph [the defendant] and Palmore
said, 'Is that you, Enoch?' and I said, 'Yes; it's me;'
and I said, 'What is the matter out here?' and he said,
'We have got a dead man out here;' and we drove on
down the road something like 100 yards, and we got
out and started back, and when I got in about 20 feet

of them Mr. Frank Palmore stepped out in the road and said, 'This is not a dead man, Enoch; it is not anybody but Mr. Charlie Gowan, drunk and taking a nap;' and I said, 'No; it is not nothing but a drunk man, and I don't want to get tangled up with him;' and then I turned around and got back on the buggy."

This occurred between 11 and 12 o'clock.

The state's evidence also tended to show that the defendant lived in the community of the deceased's home, and that soon after deceased disappeared the defendant absented himself from the community.

On Monday evening after the deceased disappeared on Saturday night the wife of the deceased had a conversation with the defendant at his home, which she details as follows: "When I was talking to him, I asked him where was Tully the last time he saw him, and he sorter dropped his eyes and said the last time he seen him he was at Palmore's and I said to him, 'Rudolph, you know where he is at.' In reply to that he did not say anything."

The state also showed by Leo Metcalf that on Sunday night, a week after the disappearance of Etheridge, the defendant and Metcalf had a conversation about the disappearance of Etheridge at Hartford, which the witness details as follows: "And I told him, 'Rudolph, I hear they have a warrant for you.' He said, 'Well, so have I.' And I told him I heard the man was missing and they were searching the river for him, and he said, 'Yes; and they won't find him,' and I said, 'Well, they have got you accused of it.' and he said, 'Yes; and I heard that he was gone,' and I told him that I had heard that, too. So we talked on, rocked along on the subject, and he said, 'I have got to go home,' and I said, 'Well, Rudolph, if they have got a warrant for you, what

are you going to do?' and he said, 'Well, if they get me, they will get me between here and home; I am going home and put my daddy's mule in the lot and hike and leave.' "

The defendant testified as a witness in his own behalf, and while he makes no positive denial of being responsible for the death of Etheridge, he testified that the last he saw of him was on the road near Palmore's home, and that deceased and Jesse Palmore went off together in the direction of Palmore's house, leaving Frank Palmore and defendant with McGowen, who was drunk and asleep, and offers evidence tending to corroborate his testimony. The defendant testified that when the buggy in which he, deceased, Palmore, and McGowen were riding was near Palmore's place on the road some one shot a pistol; that he did not know who it was; but that he did not think it was fired from the buggy. The defendant also offered evidence tending to show that deceased was "bootlegging" liquors through the community, and stated to one or more persons that he was going to have more money than he had; that he was going to play a "skin game" the next day; and that deceased tried to borrow some playing cards.

The evidence further showed that near where the body was found a turpentine tree had been recently fired, and the fire extinguished, but there was nothing in the evidence, other than this fact, tending to show that any game had been played at this place. The defendant admitted that he told Metcalf that Ethridge's body was not in the river, but denied that he had the conversation detailed by Metcalf at the time and place stated by Metcalf. The defendant did not deny the conversation detailed by the wife of the deceased or his conduct on the occasion of the conversation.

2—13

The defendant offered evidence of his good character, some evidence tending to show that deceased was seen at the house of Horace Thomas, a negro, where there was a gathering of negroes, about 12 o'clock, and that deceased called for the negro Horace Thomas, and they went away together, but this was denied by Thomas. and he gave evidence to the effect that deceased was not at his place after his first visit about 7 o'clock in the evening. There was evidence showing that after Enoch Lighter passed the defendant on the roadside the defendant came to the negro party at Thomas' place, and went away and stayed some time, and returned again to the negro's house.

During the examination of Mrs. Tully Etheridge she was asked the following questions, over the defendant's objection: "Q. What did he [deceased] carry off with him? A. He carried off his pocketbook. Q. What was in that pocketbook, Mrs. Etheridge? A. $19.81."

This witness was also allowed to testify against the objection of the defendant that between 11 and 12 o'clock she heard talking in the direction of Palmore's place and recognized her husband's voice, and then she heard two reports of a pistol firing.

The defendant showed by three witnesses, nonexpert, that they went to the place where the body was found and dug down in the earth three to four inches and found maggots, and that the ground was discolored, and that the discoloration was blood. Among those giving evidence of this character was Frank Moore, and after he had deposed to the facts above stated on his direct examination by defendant he was asked by the solicitor the question, "As a matter of fact, if a body is thrown out on the ground, and it stays there until decomposition sets in, isn't it a fact that it will discolor the

ground?" and, over the objection of the defendant that the question called for expert testimony, and that the witness was not shown to be competent to give his opinion, the court allowed the witness to answer, "Yes; but it would not turn the ground red," and overruled motion to exclude this answer.

Before the argument of the case, and before the case was submitted to the jury, the defendant requested the court in writing to instruct the jury as to the law as applicable to manslaughter in the first degree, and the court declined to grant this request.

The following charges were refused to defendant: (A) Affirmative charge.

(4) The court charges the jury that if, after considering all the testimony in this case, the state has failed to show a motive for the commission of the crime on the part of defendant, that the failure to show such a motive is a strong presumption in favor of defendant's innocence.

(14) The court charges the jury that before they can convict defendant they must be satisfied to a moral certainty not only that the proof is consistent with defendant's guilt, but that it is wholly inconsistent with every other rational conclusion, and, unless the jury are so convinced by the evidence of defendant's guilt that they would each venture to act upon that decision in matters of the highest concern and importance to their own interest, they must acquit.

(36) To convict in a criminal case on circumstantial evidence, the jury should be so convinced that they would be willing to act upon it in matters of highest concern to their own interest.

(15) It is a well-settled rule of law that, if there be two reasonable constructions which can be given to facts

proven, one favorable and the other unfavorable to a party charged with crime, it is the duty to give that which is favorable, rather than that which is unfavorable.

(31) The humane provision of the law is that there should not be a conviction unless to a moral certainty it excludes every reasonable hypothesis other than that of the guilt of the accused. No matter how strong the facts may be, if they can be reconciled with the theory that some other person had done the act, then the guilt of the accused is not shown by that full measure of proof which the law requires.

(38) No matter how strong the circumstances, if they can be reconciled with the theory that some one other than defendant committed the crime, defendant should be acquitted.

(40) If, after considering all the evidence in the case, there is a probability that some person other than defendant killed Tully Etheridge, then they must acquit.

(42) If the jury can account for the death of Tully Etheridge upon any other reasonable hypothesis than that defendant killed him, they should acquit.

(48) Same as 40.

(N) Although the jury may believe from all the evidence in this case that the death of Tully Etheridge was caused by some act of defendant, yet the jury cannot find him guilty of murder in either degree, or of manslaughter in the first degree, unless they should further believe from the evidence beyond all reasonable doubt that such act was inflicted with the intention to kill Etheridge, or unless defendant intended to do such act of violence from which ordinarily, in the usual course of events, death or great bodily harm might have been the consequence.

B. G. FARMER, for appellant.

W. L. MARTIN, Attorney General, and W. H. MITCHELL, Assistant Attorney General, for the State.

BROWN, J.—(1) The fact that the deceased when he left home had money in his possession was pertinent, as tending to show motive for the crime, as was the testimony showing that deceased exhibited his purse at Snellgrove's house and made statements with reference to the value of its contents in the presence of the defendant, and this testimony was properly allowed to go to the jury. While evidence showing motive is not indispensable, and therefore not an element of the burden of proof resting on the prosecution, motive is always a legitimate subject of inquiry on the trial of one charged with crime, and this is especially true where the evidence tending to connect the defendant with the commission of the crime is wholly circumstantial.—*Brunson v. State,* 124 Ala. 40, 27 South. 410; *Flanagan v. State,* 46 Ala. 703; *Baalam v. State,* 17 Ala. 451; *Overstreet v. State,* 46 Ala. 30; *Levison v. State,* 54 Ala. 528; *Faire v. State,* 58 Ala. 79; *Duncan v. State,* 88 Ala. 34, 7 South. 104.

(2) In popular use intent and motive are not infrequently regarded as one and the same thing, and, while they have the common characteristic of not being susceptible of proof other than by inference arising from the existence of other facts, in law there is a clear distinction between them. Motive is the power which impels action to a definite result; the reason that moves the will and tempts the mind to indulge the criminal intent; while the intent is the purpose to use a particular means to effect the result and accomplish the purpose. The criminal intent is an essential element of the

crime, but, when the crime is certainly proven to have
been committed by the person charged therewith, the
question of motive may be of little or no importance.
—*Brunson v. State, supra; People v. Molineux,* 168 N.
Y. 264, 61 N. E. 286, 62 L. R. A. 193; 28 Cyc. 20; 22
Cyc. 1454, note 15.

(3, 4) The character of the weapon used in accom-
plishing the death of Etheridge is alleged in the indict-
ment as an unknown fact, and at the time the court al-
lowed the wife of the deceased to testify that between
11 and 12 o'clock on the night her husband disappeared
she heard loud talking in the direction of and near
Palmore's place, and that she recognized her husband's
voice, and immediately thereafter or during the time of
the loud talking she heard the report of a pistol firing
in the same direction and locality, no proof had been
offered showing the character of the weapon used in ac-
complishing the death of Etheridge or of the character
of the wound on the head of the body found in the woods.
That Etheridge was killed by being struck on the head
with a pistol, or even shot with one, under the indict-
ment was within the issues. (*Terry v. State,* 118 Ala.
87, 23 South. 776; *Terry v. State,* 120 Ala. 287, 25 South.
176), and the firing of the pistol at the place where the
witness last heard her husband's voice was a fact tend-
ing to show that some one had such a weapon at that
place, and, if it should be conceded that no further ef-
fort was made by the prosecution to develop evidence
showing that such weapon was used to effect the death
of the deceased, the court properly admitted the evi-
dence at the time it was offered; and if it should be fur-
ther conceded that the evidence subsequently admitted
showing the character of the wound on the head dis-
proved the theory that the wound was inflicted by a blow

on the head with a pistol or a pistol shot, the evidence being competent at the time it was offered, the question of its relevancy to the issues, as defined by the subsequent proof showing the character of the wound, could only be presented by motion to exclude it, and no such motion was made.

(5) To authorize proof of a declaration made by the defendant after the offense was committed, with reference to the crime, the declaration need not amount to a confession of guilt. All that is necessary is that the statement be self-disserving and of such a character as, when considered along with the other evidence in the case, reasonably affords an inference of guilt.—*Johnson v. State, infra,* 68 South. 687; *Pentecost v. State,* 107 Ala. 90, 18 South. 146; *Aikin v. State,* 35 Ala. 404; Jones on Evidence, § 236, p. 300; 12 Cyc. 418b; *Commonwealth v. Chance,* 174 Mass. 245, 54 N. E. 551, 75 Am. St. Rep. 306.

(6) There was no error in receiving the testimony of the witness Metcalf as to statements made by the defendant to witness when they were speaking of the disappearance of Etheridge and the rumor that a warrant was in the hands of the officers of the law for defendant's arrest, in connection with which defendant said: "Well, if they get me, they will get me between here and home; I am going home and put my daddy's mule in the lot and hike and leave."

These statements, if believed by the jury, under the rule stated were, when considered in connection with the other evidence in the case, sufficient to afford an inference that they were prompted by a consciousness of guilt, and the weight to be accorded this evidence was a question for the jury.—*Pentecost v. State, supra; Aikin v. State, supra.*

(7) The testimony of Mrs. Etheridge as to a conversation between her and the defendant shortly after the disappearance of the deceased, in which she asked the defendant where he last saw her husband, and his conduct on that occasion when she told defendant that he knew where her husband was and his failure to reply, was competent evidence, and the court ruled correctly in admitting it.—16 Cyc. 956, 957 (7); *Wisdom v. Reeves,* 110 Ala. 418, 18 South. 13; *Peck v. Ryan,* 110 Ala. 336, 17 South. 733; *Claflin v. Rosenberg,* 101 Ala. 213, 13 South. 272; *Bob v. State,* 32 Ala. 560; *Abercrombie v. Allen,* 20 Ala. 281.

(8, 9) The witness Moore was offered by the defendant, and testified on direct examination by the defendant that he went to the place where the body was found and dug down under the place where the head rested, and found the earth discolored, that it was red, and that there was blood there. On cross-examination the court allowed the solicitor to ask the witness if, as a matter of fact, a dead body was thrown on the ground and remained there until decomposition took place, whether it would not cause a discoloration of the ground. The witness answered: "Yes; but it would not turn the ground red." It is now insisted that this was error because the witness had not qualified as an expert. If the witness was competent to testify that the discoloration of the ground was caused by blood, he was certainly competent to answer the question propounded to him by the solicitor, and, whether he was or not, the defendant, having offered him as a competent witness to testify on the subject, was in no position, after he had proven what he thought was favorable to his case, to object to his competency to give testimony of an expert nature concerning the same matters on cross-examina-

tion. By offering the witness the defendant not only represented him to be credible, but competent to testify to the facts defendant sought to prove, to wit, what had caused discoloration of the earth where the body lay. The cross-examination was proper as testing the knowledge of the witness as to the matters previously deposed to by him, and the objection was properly overruled.

(10) The evidence showing that the head was severed from the body when found was properly admitted.— *Terry v. State,* 118 Ala. 86, 23 South. 776; *Terry v. State,* 120 Ala. 287, 25 South. 176.

(11) The record does not affirmatively show that the failure of the prosecution to prove the venue was brought to the attention of the trial court before the argument of the case was concluded, and as for that matter at all, and, in the absence of such showing, the trial court will not be put in error for refusing the affirmative charge. —Circuit court rule 35 (175 Ala. xxi).

(12, 13) Malice is an essential ingredient of murder. —*Mitchell v. State,* 60 Ala. 26. As a rule, it is an inferential fact not susceptible of positive proof. It arises by inference from other facts proven, and in the trial of cases of homicide is to be drawn by the jury, unless the evidence shows, without room for adverse inference, that the killing was intentional, and was accomplished by the use of a weapon which, as a matter of law, may be pronounced a deadly weapon.

(14, 15) Where the killing results from the intentional use of a deadly weapon—that is, a weapon which the court may pronounce such as a matter of law, such as a gun or pistol of sufficient caliber and carrying force as to produce death—and the evidence which proves the killing does not at least afford room for an inference

rebutting the presumption of malice arising from the use of such weapon, it is then incumbent on the defendant to rebut that presumption by other evidence. If he fails in this burden, the presumption is conclusive against him, and no duty devolves upon the trial court to instruct the jury on any degree of homicide less than murder.—*Gafford v. State,* 125 Ala. 1, 28 South. 406; *Hornsby v. State,* 94 Ala. 66, 10 South. 552; *Hadley v. State,* 55 Ala. 37; *Mitchell v. State, supra; Gibson v. State,* 89 Ala. 121, 8 South. 98, 18 Am. St. Rep. 96; *Rogers v. State,* 117 Ala. 9, 22 South. 666.

(16) But, where the evidence which proves the killing rebuts the presumption of malice, or affords room for an inference to be drawn by the jury that tends to rebut the presumption, or where the evidence is wholly circumstantial, and the character of the weapon, the circumstances attending the homicide, and the motive therefor rest in inferences to be drawn by the jury from the circumstances proven, the court should give in charge to the jury the law on all degrees of intentional homicide.—*Fowler v. State,* 161 Ala. 1, 49 South. 788; *Hornsby v. State,* 94 Ala. 66, 10 South. 522; *Hall v. State,* 40 Ala. 706; *Reeves v. State,* 186 Ala. 14, 65 South. 160. The reason for this is clear. In such cases malice, which is an essential ingredient of murder, must be inferred from the character of the weapon used and the circumstances attending the homicide, and, where there is evidence justifying an inference that the killing was not prompted by malice, or where the nature and character of the weapon and the circumstances attending the homicide rest in inference, it is the province of the jury, and not of the court, to pass on the evidence and entertain the inference of malice or not, as, in their judgment, the whole evidence may warrant.—*Hornsby v. State, supra; Smith v. State,* 68 Ala. 430.

The trial court therefore erred in disregarding the defendant's request to charge the jury as to the law of manslaughter in the first degree, and for this error the judgment must be reversed.

(17) The law does not impose on the prosecution the burden of proving motive for a crime, and therefore a failure to prove motive does not raise any presumption in favor of the defendant, as asserted in refused charge 4.—*Stone v. State*, 105 Ala. 60, 17 South. 114. Proof that the accused committed the criminal act furnishes all the evidence of motive that the law requires.—*Brunson v. State, supra; Clifton v. State*, 73 Ala. 473.

(18) Charges 14 and 36 are of a class that have been repeatedly condemned.

(19) Charge 15 was properly refused.—*Key v. State*, 4 Ala. App. 76, 58 South. 946.

(20) Charges 31, 38, 40, 42, and 48 ignore the tendencies in the evidence that the defendant was an accomplice of some other person who might have actually inflicted the blow causing the death of the deceased, and were properly refused.

(21) Charge M is not complete within itself, and was well refused for this reason.

(22) Charge N does not state the law correctly, and, although it may have been more favorable to the prosecution than a charge embodying a correct statement of the law, yet the court was under no duty to give it. The proposition which the charge undertakes to state is: "An actual intention to take life is not an essential element in this offense [manslaughter in the first degree], or, indeed, in murder. The voluntary setting in motion or application of unlawful force, * * * whereby death ensues, will suffice to supply the legal elements of evil intent, however free the action may be from actual

purpose to kill."—*Lewis v. State,* 96 Ala. 10, 11 South. 259, 38 Am. St. Rep. 75; *Fowler v. State,* 161 Ala. 6, 49 South. 788.

"To constitute manslaughter in the first degree, there must be either a positive intention to kill or an act of violence from which ordinarily, in the usual course of events, death or great bodily harm may result. It is not necessary that the perpetrator intended or willed the death of the party."—*Reynolds v. State,* 154 Ala. 14, 45 South. 894.

(23) An examination of the charge shows that it assumes that the act resulting in the death of Etheridge was an act of violence or an unlawful act without so stating, and for this reason the charge cannot be approved.

The only error shown by the record is the one above pointed out, and for this the judgment of the circuit court must be reversed.

Reversed and remanded.