42 So.2d 512

### LANG v. STATE.
### 8 Div. 489.

Supreme Court of Alabama.
Oct. 20, 1949.

Russell W. Lynne, of Decatur, for appellant.

A. A. Carmichael, Atty. Gen., and Francis M. Kohn, Asst. Atty. Gen., for the State.

LIVINGSTON, Justice.

The appellant, James Lester Lang, was indicted by the grand jury of Morgan County, Alabama, for murder in the first degree. The jury returned a verdict convicting him of murder in the second degree and fixed his punishment at ninety-nine years in the State penitentiary. The victim was Mrs. Christine Haynie, about thirty-seven years of age, who left surviving her a husband and six children. It was not shown that appellant and Mrs. Haynie were acquainted, and the verdict is rested on evidence entirely circumstantial.

The Bee Line Highway runs north and south in Morgan County and is some two miles east of where the crime was committed. Distances hereinafter mentioned are approximate. A dirt or country road, hereinafter called the country road, three miles long connects the Bee Line Highway with the Battle Ground Highway. This

country road, by no means straight, runs in a general east and west direction. Where the country road intersects the Bee Line Highway is located what is known as Hammet's store and where it intersects the Battle Ground Highway is located what is known as Bibb's store.

The Haynies lived one mile northeast of the country road, at a point which made their home two miles from Hammet's store and two and one-half miles from Bibb's store. Other State witnesses lived on or near the country road. The appellant was living with his brother, Roy William Lang (referred to in the record sometimes as Roy, sometimes as William), and his wife and three children. Roy Lang's home is on the north side of the country road and one-half mile east of Bibb's store. Ely Edmondson, Roy Lang's father-in-law, lives on the north side of the country road one hundred yards east of Roy Lang.

On the morning of April 6, 1948, starting about 8 o'clock, the appellant, Roy Lang and one Woods drove Roy Lang's wagon to Mr. Evans' place on the Bee Line Highway, some distance north of Hammet's store. Roy Lang and Woods boarded a bus to Hartselle. Appellant did not go to Hartselle, but walked to the home of Ely Edmondson arriving some time between 4 and 5 o'clock in the afternoon. Ely Edmondson was sawing stove wood between his home and the country road. Appellant sat down on the wood pile and he and Edmondson talked for an hour or an hour and a half. While appellant and Edmondson were thus engaged, about 5 o'clock, Mrs. Haynie came by on the road going in the direction of Bibb's store. She had a scarf or piece of cloth wrapped around her hair and was carrying an open umbrella. The parties spoke to one another but Mrs. Haynie did not stop. Some where around 6 o'clock Edmondson went to his barn to put up the stock and did not see appellant any more until that night about 10 o'clock. Mrs. Edmondson and her daughter, Mrs. Roy Lang, saw appellant, about 6 o'clock or a little before, go east on the country road. Going east from Edmondson's home, the country road curves to the left around a hill or rise. Some ten or fifteen minutes after appellant left, Mrs.

Haynie came back from Bibb's store with a paper bag containing groceries. She stopped in front of the Edmondson home and talked with Mrs. Edmondson for a few minutes and then left going east towards her own home. It had rained the night before and the road was muddy. When Mrs. Haynie left the Edmondson home she did not follow the country road but took a little used roadway north of the country road and running across the hill or rise which the country road went around. The two roads again joined some half mile east from the Edmondson home. That was the last time Mrs. Haynie was seen alive. Roy Lang and Woods returned to Mr. Evans' place about 5:30 in the afternoon, secured their wagon and proceeded to Roy Lang's home, a distance of some four miles, arriving there about 7 o'clock. At a point about a mile from Edmondson's home, Roy Lang noticed a paper bag containing groceries by the roadside which he picked up and carried home. While Roy Lang and Woods were unhitching the team, appellant appeared coming from a northerly direction along a roadway running more or less north and south. Appellant called to Roy Lang and Woods and went on into the house, entering the kitchen. Mrs. Beulah Lang, Roy's wife, testified that when appellant came in the kitchen he was drunk and cursing and sweating; that she put some coal oil on some scratches on one of his legs above the knee; that she did not notice whether his pants were torn; that Roy Lang came in shortly and he and appellant ate supper and the family retired, all of them sleeping in one room in two beds. Roy and his wife in one bed and the three children and appellant in the other.

Riley Haynie, husband of the deceased, also went to Hartselle the day Mrs. Haynie was killed and returned home about 7:30 or 8 o'clock that night. Not finding Mrs. Haynie at home, he went to a neighbor's home and made inquiry concerning her, and getting no information he proceeded to Roy Lang's house arriving about 10 o'clock. He was advised of Mrs. Haynie's movement in the afternoon. Roy Lang and appellant dressed and went with Haynie to the home of Ely Edmondson and aroused him, whereupon Haynie, Edmondson, Roy

Lang and appellant went in search of Mrs. Haynie, proceeding first to the place on the side of the road where Roy Lang had picked up the bag of groceries. From that point (using the language of some of them) "they fanned out" and proceeded to search the woods for Mrs. Haynie, using a flash light and lantern. Edmondson discovered the dead body of Mrs. Haynie about 11 o'clock that night, some one hundred and fifty or more yards from the point where the groceries were found, some sixty yards north of the country road. From the point where the body of Mrs. Haynie was found to Ely Edmondson's home, measured by the speedometer of an automobile, is eight-tenths of a mile. The scarf or cloth, which Mrs. Haynie wore on her head when last seen, was tied tightly around her neck, and the evidence is that she was choked or strangled to death. The evidence tended to prove that she had been raped. The genital organs were scratched and bruised to some extent, but no semen was found in the vagina or on the body.

About 3 o'clock the next day, April 7th, officers of the law traced a man's foot prints from a point in the country road, which point is in front of the Edmondson home, eastwardly along the country road to where it intersects with the roadway leading across the hill or rise east of the Edmondson home, the route taken by Mrs. Haynie when she left Edmondson's home on the afternoon she was killed. The man's tracks and the woman's tracks came together at this intersection, and they were traced some distance further east. Officers also testified that they found similar tracks of a man in the vicinity and west of where Mrs. Haynie's body was found. The evidence is conflicting as to whether these tracks could have been made by appellant when he was searching for the body of Mrs. Haynie on the night of April 6th. There is some evidence to show that the tracks made in the roadway and in the vicinity of where Mrs. Haynie's body was found, were made by defendant.

Other witnesses testified whose evidence was merely negative in character and is to the effect that the witnesses saw no one else in the neighborhood at or near the time and place where Mrs. Haynie was killed. The terrain along the country road is hilly, sparsely settled, some land cleared and in cultivation, some cleared but not in cultivation and grown up in briers, weeds and sedge, others in woodland and small trees.

We have made no attempt to set forth all the evidence contained in a record of over two hundred pages, but have set out its most damaging features insofar as appellant is concerned.

■ Opportunity to commit crime, or even knowledge of its commission, without more, is not sufficient evidence upon which to base a verdict of guilt. Thomas v. State, 19 Ala.App. 499, 98 So. 322.

" 'The humane provisions of the law are, that a prisoner, charged with a felony, should not be convicted on circumstantial evidence, unless it shows by a full measure of proof that the defendant is guilty. Such proof is always insufficient, unless it excludes, to a moral certainty, every other reasonable hypothesis, but that of the guilt of the accused. No matter how strong the circumstances, if they can be reconciled with the theory that some other person may have done the act, then the defendant is not shown to be guilty, by that full measure of proof which the law requires.' Ex parte Acree, 63 Ala. 234.

"This statement of the law, often repeated in substance, is expressive of the deep solicitude of the law that the guilty, and the guilty alone, shall be punished for crime.

"These considerations are particularly applicable to this case. Here was an atrocious crime. The vital issue is the identity of the perpetrator.

"The evidence is circumstantial. The court has read it in consultation. Indulging the strong presumption to be accorded the verdict, we are clearly convinced the motion for a new trial should have been granted upon the ground that the proof is not of that conclusive character demanded by the law."—Cooper v. State, 235 Ala. 523, 180 So. 102. See, also Wilson v. State, 243 Ala. 1, 8 So.2d 422; DeSilvey v. State, 245 Ala. 163, 16 So. 2d 183.

A further discussion of the facts in this case would be of no benefit.

Reversed and remanded.

FOSTER, LAWSON and STAKELY, JJ., concur.

BROWN and SIMPSON, JJ., dissent.

BROWN, Justice (dissenting).

The Grand Jury of Morgan County at the July Term of the Circuit Court of said county indicted the defendant for the murder of Christine Haynie. The indictment contained two counts, the first charging the said defendant unlawfully and with malice aforethought killed Christine Haynie by strangling her with a piece of cloth. The second in like form charged that said defendant unlawfully and with malice aforethought killed Christine Haynie by strangling her with a scarf. Both of said counts follow substantially the form prescribed by the statute. Code of 1940, Tit. 15, § 259, form 79.

The defendant challenged the sufficiency of both counts by demurrer on grounds among others that, "It is not alleged or shown what kind of a piece of cloth was used in the alleged homicide or that a better description was unknown to the grand jury." We are of the opinion that the indictment was sufficient. The court did not err in overruling the demurrer. Code of 1940, Tit. 15, § 259, form 79; Scott v. State, 141 Ala. 1, 37 So. 357; Harvey v. State, 15 Ala.App. 311, 73 So. 200.

We have examined the several rulings of the court touching the formation of the petit jury for defendant's trial and find nothing that requires special treatment. The several rulings are free from error.

On his arraignment the defendant pleaded not guilty and on his trial was found guilty by the jury of murder in the second degree and his punishment fixed at ninety-nine years imprisonment in the penitentiary. The defendant made motion for new trial which was by the court passed from time to time and on the hearing was taken under advisement and later overruled. From the judgment of conviction and sentence entered on the verdict of the jury, the defendant has appealed.

Before beginning his statement of the case in brief, appellant's counsel observes: "The record in this case is voluminous comprising some two hundred pages in the transcript. The state examined seventeen witnesses, *and the defendant called no witnesses in his behalf, nor did he testify."* [Italics supplied.]

The defendant's contention, to state it in the language of his brief, is that: "The evidence in this case is wholly insufficient to sustain a conviction. The most that can be said in behalf of the evidence from the State's side is that it comes close to showing that the defendant had an opportunity to commit the homicide. All that the jury had before it upon which to base a verdict of guilty was prejudice, suspicion, surmise and conjecture. The prejudice and sympathy of the jury was aroused, of course, by the introduction of the photograph set out on page 8 herein."

We have painstakingly examined the record and we now state the facts as disclosed by the record and the circumstances, in sequence, that point to the defendant's guilt.

The dead body of Mrs. Haynie was found about 10:30 p. m. on Tuesday the 6th of April, 1948, in a thicket of pines north of the country road leading east to west and running between the Bee Line Highway on the east—the "old corn road" —to what is referred to in the evidence as the Battle Ground Highway. As a matter of history it is the Old Day's Gap Road leading from Danville, Alabama, over the mountain to Gadsden travelled by General Nathan Bedford Forrest and his cavalry during the Civil War. Hence the "Battle Ground." This country road leads through a sparsely settled community inhabited by white people only and is about two and one-half miles in length. This road is a crooked and winding country road and the evidence shows that no one was seen on this road on April 6, 1948, except the witnesses who testified, the deceased and the defendant. At the point where the country road intersects the Bee Line Highway (State Highway No. 31) is Hammet's Store on the east side of the highway. Immediately north of Hammet's Store is the residence of Mr. Evans and west of Evans' house off the bend of the country road about one mile was the place of residence of the Haynie family consisting of

husband, wife and six children, said residence being located on Hart's land. The Haynie home, as the evidence goes to show, is located approximately a mile from the country road and a roadway commencing at Haynie's house which leads into the country road just in front of Mr. Hart's house, a mile west of Haynie's house. The next residence going west is that of Mr. Partain, a short distance from Hart's house on the side of the country road facing south. Latham's house is situated south of the country road slightly east of Partain's place. West of Partain's house, eight-tenths of a mile on the north of the country road is the pine thicket where Mrs. Haynie's body was found. This thicket is located near the end of a sharp bend in the country road and near the intersection of the private road that leads over the hill through Ely Edmondson's pasture. At the other end of the sharp bend in the country road and some distance west thereof is Edmondson's residence and immediately in front of the house across the road stands Edmondson's barn. Roy William Lang's residence is on the north side of the road about a hundred yards from Edmondson's house.

The evidence shows that the victim of the murder was a young woman 35 years of age, the mother of six children and living with her husband at their home located as above stated. The evidence shows without dispute that Mrs. Haynie was killed by strangulation and that the scarf which she wore on her head was tightly tied around her neck. The condition of the body and the dress she wore show external violence was inflicted on her person and the testimony further goes to show that the murder was committed by some one who attempted to rape her. The genital organs were torn and mutilated, her dress was pulled up above her knees and she was lying flat on her back with her legs apart. The dead body of deceased was found in the thicket located in Morgan County near the line between Cullman and Morgan Counties within the jurisdiction of the Circuit Court of Morgan County.

The evidence goes to show that William Lang (also referred to as Roy) the brother of the defendant, son-in-law of Ely Ed-

mondson, had recently moved into the community and knew very few of the people living therein. The defendant, a bachelor 38 years of age, lived part time with his brother William and worked in the crop which was growing or being planted on the lands of Mr. Edmondson, who owned the same or had the same under lease. The defendant some of the time lived in a vacant house somewhere on the Edmondson land and was often absent and his whereabouts unknown. On Thursday next before Tuesday, the 6th of April, while defendant was plowing in the field, his brother William carried him a gord of drinking water and while they were together on that occasion they discussed sex and the defendant in vulgar and uncouth language asked William if he know where he could get some one to satisfy his sexual desires. William told him that he had recently moved into the community and did not know many of the people and did not know such person.

In the early morning of April 6th, William Lang and Leonard Wood spliced up a team, Wood furnishing one mule or horse and William Lang the other, and drove over to the home of Mr. Evans on the Bee Line Highway, left their wagon and team there and caught the bus and went to Hartselle. The defendant went along with them to the Evans home. The Evans home is a short distance east of the home of Haynie. The defendant was seen by two witnesses near the Haynie home as he passed the houses of Hart and Partain going west on this country road about 3 o'clock in the afternoon toward Edmondson's house, where Edmondson was out in front of the house at the wood pile cutting wood. Defendant stopped and sat on the wood pile and talked to Mr. Edmondson and offered him a drink and remained there until Christine Haynie came by on the country road on her way to Bibb's Store late in the afternoon between 5 and 6 o'clock.

The evidence shows that Mrs. Haynie went to the store to buy groceries and other things which she carried back with her on her return toward her home. As she passed the Edmondson home going to Bibb's store, the defendant recognized her and spoke to her and then Mr. Edmondson spoke and she spoke. It seems that Ed-

mondson did not know Mrs. Haynie before that time but defendant did and stated to Edmondson that she was Mrs. Haynie. Mrs. Haynie late in the afternoon between 5 and 6 o'clock came back on the country road to the Edmondson home with her groceries and stopped and had a conversation with Mrs. Edmondson, who suggested because of the rain that had fallen the night before and on the 6th of April that Mrs. Haynie could make better progress if she would take the private road through the field which was the pasture of Mr. Edmondson, and save some distance. The defendant remained at Edmondson's wood pile until a short time before Mrs. Haynie returned from the store. Defendant left the wood pile ten or fifteen minutes before Mrs. Haynie returned and passed the Edmondson's home. Defendant followed the country road and passed around the sharp bend in the road and was observed by Mrs. William Lang as he passed out of sight. The last that was seen of the defendant before the murder, he was going east around the sharp curve on this country road.

The evidence further goes to show that defendant's shoe prints and the tracks of the deceased came together where said field road runs into the country road, a short distance from the pine thicket where the body was found. The shoe prints of defendant were identified by Mr. Troup, the special investigator for Morgan County, who made measurements of said tracks and who later measured defendant's shoes, showing that they and the shoe tracks were 11 inches in length, 4½ inches wide at the widest part of the sole and about 3½ inches wide at the heel. The toes turned up sharply and the tracks indicated, as the witness testified, that they were made with such a shoe, the measurements corresponding exactly. The foot prints of the woman were also identified by Mr. Troup along the private road which leads into the country road a short distance from the pine thicket where the body was found. The man's shoe prints and those of the woman came together at the end of the private road and continued side by side to within 20 or 25 feet of the pine thicket.

William Lang and Wood on their return home from Evans' place late in the evening found the groceries on the road a short distance from the pine thicket. They stopped and picked up the sack containing the groceries and carried them to William Lang's house. William Lang and Wood then unhitched the team from the wagon. Wood got on his animal and started in the direction of his home. Whether or not Wood returned to his home over this country road does not appear.

Defendant returned to the home of his brother after William had come home with the wagon about dark, about 7 o'clock. The evidence goes to show that he was drunk. One of his legs was badly scratched and bleeding and he complained about his condition and his sister-in-law Mrs. William Lang examined his wounds and doctored them. The wounds extended above the knee and downward. She also testified that when defendant returned to her home where he stayed occasionally and lived part of the time, he appeared at the door and said: "I am just as drunk as a God damn son of a bitch. Don't nobody mess with me and they won't get hurt." His shirt was wet with perspiration and the sweat was streaming down his face and Mrs. Lang testified, "I could see sweat through his sweat shirt between the shoulders. The sweat shirt between the shoulders was wet through." This was just a little after dark. She further testified that she saw defendant going east on this road in front of her house and as he walked around the end of the curve. After he went around the curve, "I saw this woman pass in front of our house going in the same direction he had gone. Mrs. Haynie came along, I would say in about ten or fifteen minutes. Mrs. Haynie had her sack of groceries. Mrs. Haynie passed the house just a bit after 6 o'clock. It was just a few minutes after dark when Lester returned to the house." She also testified to a conversation with the defendant after he returned to the house. That he said that he had been down yonder asleep. "Some God damn son-of-a-bitch came down there and shined a light in his face and woke him up." She testified that he said

he got up and "cussed this son-of-a-bitch and he got tangled in a barb wire fence; said he cussed the son-of-a-bitch 30 minutes; he said his legs were torn up and he showed it to me. I think it was the right leg. I put coal oil on the portion of the leg above the knee and down his leg where the blood was and I doctored the places. I just doctored the front of the leg." Mrs. Lang further testified that when defendant came in she was preparing supper. He came to the table and ate. Soon after supper they all retired for the night, including the defendant, who slept in the same room in a different bed from that occupied by William and his wife. That the defendant appeared to be restless and rolling in bed and mumbling and this was kept up until about the time that Mr. Haynie came searching for his wife. Haynie told William that he was looking for his wife and asked him to go with him to search for her and William got up and dressed and went with Haynie to the house of Mr. Edmondson. After Haynie and William left to go to Edmondson's house, the defendant got out of bed and while dressing said to Mrs. Beulah Lang, "Where is my G—d—coat?" After dressing he followed William and Haynie to Edmondson's house. They, Edmondson, Haynie, William Lang and the defendant, started on the search for Mrs. Haynie.

The searchers went across the road through the pasture and on to the spot where the groceries were found and near this spot there was a trampled spot where it appeared to have been trampled, but foot prints could not be distinguished. Mayberry v. State, 107 Ala. 64, 18 So. 219. The searchers then spread out and proceeded north and Mr. Edmondson located the body in the pine thicket. In between the road and the pine thicket was sage bramble and briers covering the ground. The shoe prints of the man and the woman led to within twenty or twenty-five feet of the body. After the body was found Haynie went to his home to get his children; Edmondson and defendant remained near the spot where the body was found and William Lang went to call the officers of the law. The evidence shows that the man's tracks corresponding to the measurements of defendant's shoe were found north of the body

of Mrs. Haynie and within six feet thereof in a ditch leading west down through the woods and back into the road still leading west.

While the defendant was at William Lang's house after his return, before supper, something was said about what to do with the groceries and defendant suggested the thing to do was to keep them that somebody might call and inquire about them. The evidence further shows that the defendant asked his brother if he had $30 he could loan him and William told him he did not and defendant told him if he did not loan him the money he could not work in his crop any more. Mrs. William Lang testified that defendant never returned to their house after the body was found, that he had not been there since April 6, 1948.

On April 6th just before or about 3 o'clock in the afternoon defendant was seen passing along the road in front of the houses of Hart and Partain, going towards Edmondson's home and away from the house of Haynie. Haynie left home in the afternoon and went to the Bee Line Highway and caught the bus about 3 o'clock to go to Hartselle. He returned on the bus leaving Hartselle about 7 or 8 o'clock and found that his wife was missing from home and he immediately started out to make a search for her with the result stated above.

The tracks leading west down the ditch, as it was the province of the jury to find, were made after the defendant had killed his victim and was leaving the scene. His effort to borrow money was prompted, as the jury was authorized to find, by his desire to run away from his crime. In view of the upset condition of the defendant when he returned to his brother's home and the other circumstances stated, the case was properly submitted to the jury. This court speaking through Brickell, Chief Justice, in Howard v. State, infra, approved the language of the opinion of Buller, J., in Company of Carpenters, &c., 1 Doug. 375, that: " 'Whether there be any evidence or not is a question for the judge. Whether it is sufficient evidence is a question for the jury.' 1 Green. Ev., § 49. The degree of the evidence, whether it must be of such force that, in the opinion of the court, the jury could reasonably conclude the issue was

proved, or the burden of proof satisfied; or whether it may have only a tendency to establish the issue, the necessities of this case do not require us to consider. It is enough to say there was not that want of criminating evidence,—such want of evidence of every fact material to a conviction, —as required that the court should withdraw it from the consideration of the jury. The facts and circumstances in evidence, if dissevered and disconnected, may be weak and inconclusive; but their probative force, when combined, as it was the province of the jury to combine them, under proper instructions from the court, may have satisfied them of the guilt of the defendant. If in their conclusions the jury should err; if their verdict should be manifestly wrong, if the evidence was not of that degree justifying a conviction of crime, the court should apply the correction of a new trial." Howard v. State, 108 Ala. 571, 18 So. 813, 815.

The trial judge, as the record shows, was very liberal to the defendant in his instructions to the jury. His oral charge is clear and concise, stating fully every principle of law applicable to the case. In addition to that, the court, at the instance of the defendant, gave some 25 or 30 written charges, one of which exacted a higher degree of proof than the law requires. We refer to charge 10, which has been repeatedly condemned. Troup v. State, 160 Ala. 125, 49 So. 332.

The defendant's objection to the introduction in evidence of the photograph designated as Exhibit A was properly overruled. This evidence was clearly competent and material as going to show violence on the person of deceased and motive. Clifton v. State, 73 Ala. 473; Jones v. State, 13 Ala. App. 10, 68 So. 690.

We have examined the several written charges refused to the defendant and find that they were either fully covered by the oral charge or written charges given or are argumentative or that they do not correctly state the law.

Appellant's counsel insists that the verdict for murder in the second degree shows that the jury had some doubt of the defendant's guilt or that some of the jurors entertained such doubt. If this should be conceded, still it is clear that the jury did not entertain a reasonable doubt of defendant's guilt.

The trial judge who heard the evidence of all the witnesses and observed their manner of testifying was in a better position to judge of their credibility, probative force and truth of their testimony than we are and after due consideration overruled the motion for a new trial. We are not able to affirm, on this appeal, that there was such want of criminating evidence going to show defendant's guilt as warrants us in holding that the circuit court erred in overruling defendant's motion for a new trial. There is no reversible error in the record and the case should be affirmed.

SIMPSON, J., concurs.