The appellant was indicted by a grand jury of Montgomery County, Alabama, for the first degree murder of Harold Wayne Washington by shooting him with a pistol. After a trial at which the appellant was represented by retained counsel, a jury found the appellant guilty of murder in the second degree and fixed his punishment at forty-five years in the penitentiary. The trial judge entered judgment and sentence accordingly. The appellant is represented by retained counsel both at his trial and on this appeal.
As grounds for reversing the conviction had in the trial court, the appellant asserts (1) that he was denied the right to confront witnesses against him by the prosecutor's use of a purported statement made by the appellant's ten-year old son to the police, and (2) that the evidence was legally insufficient to sustain the conviction.
The shooting occurred on May 26, 1976, on the front porch of the appellant's house located in the Mobile Heights section of the City of Montgomery.
While the appellant has raised the question of the sufficiency of the evidence, there is no need to recite, in minute detail, the testimony presented by each witness.
On the evening of the shooting, Mrs. Valerie Sawyer and Aaron Washington, the brother of the soon to be deceased Harold Wayne Washington, were sitting in Aaron's car listening to music. They were parked in front of the appellant's house. The deceased was next door talking to Mr. T.C. Thomas and his son.
Mrs. Sawyer, who was separated, was "going with" Joel Welch who was the appellant's half-brother. On one or two occasions prior to this night, Mrs. Sawyer had contacted the appellant about getting a message to Joel that she wanted to see him. Joel was married but he and his wife were "getting along bad". On this particular night, Mrs. Sawyer asked Aaron Washington to go get the appellant. Mrs. Sawyer wanted to see the appellant and not Joel. However, Aaron did not go.
Aaron's brother, the deceased, walked over to Aaron's car and Aaron asked him to go get the appellant for Mrs. Sawyer.
The appellant, his wife, his aunt, and his children were preparing for supper when the appellant heard a "loud", an "abrupt" knocking on his front door. When he opened the door, the deceased told him that "there is a girl wants to see you out here". The appellant told the deceased that he didn't want "nothing to do with all that, . . . I have got my wife and family *Page 1365 
here and I ain't got time for none of that. . . ." The appellant then told the deceased to get off his porch but Harold Wayne did not leave.
The appellant testified that the deceased then said, "Nigger, shoot me," and he "kept going into his pants" where the appellant saw a black handle which he thought was a pistol. The appellant further testified that Harold Wayne kept "bubbling up and everything" and his eyes were "rolling and wandering". The appellant "didn't understand where he was coming from" and the deceased kept repeating, "Nigger, shoot me", and would not leave.
The appellant went to the closet and got his .22 caliber pistol. When the deceased again put "his hand into his pants", the appellant "shot out like that and shut the door" behind him allegedly to keep the deceased from shooting into the house and hitting his wife or one of his children. The appellant testified that he did not intend to shoot the deceased, but fired just to scare him away and to keep him from shooting into the house. The deceased cried out that he had been shot, ran into the street, fell and died.
After firing one shot, the appellant testified that he called the police. "A lot of people" gathered outside and when the appellant heard them talking about "getting the gun", he turned the lights off in the house. Next, according to the appellant, Aaron Washington pulled up near his house and fired a shot which came through the kitchen window and lodged in the kitchen wall. The appellant responded by firing once out the living room window.
When the police arrived on the scene, they found a large crowd gathered three or four houses down from the scene of the shooting. The deceased was lying in the street. On order, the appellant emerged from his house. He was immediately handcuffed and placed in a patrol car. Before the patrol car left for the police station, the appellant was advised of his constitutional rights which were read to him from a standard Miranda rights form.
On the way to the station, no one interviewed or interrogated the appellant. En route the appellant voluntarily stated that the deceased "had threatened him and he had wanted to shoot to warn him to get him away from the door and that he had not intended to shoot the man; that if he had shot somebody, he did not intend to shoot him". The appellant, according to Montgomery City Police Officer Frank H. Eckerman, further volunteered the information that he was interested in getting rid of some of the drug addicts in the neighborhood. The appellant denied making this last statement and stated that he did tell Officer Eckerman that something was wrong with the eyes of the deceased.
Captain I.B. Moore, a detective for the Montgomery Police Department, found a .22 caliber pistol in the living room of the appellant's house. Captain Moore turned the pistol, along with four live rounds and two spent hulls, over to Detective Cody Wood. Detective Wood also examined the inside of the appellant's house and observed "a hole in the wall in the kitchen that appeared to be made by a bullet".
At the police station later that evening, Detective Wood interrogated the appellant after advising him of his constitutional rights. At that time the appellant freely and voluntarily gave a signed statement which was properly admitted into evidence by the trial judge.
The substance of that statement was that the appellant was sitting in the living room of his home when Wayne Washington knocked on the front door and told the appellant that Valerie Sawyer wanted to see him. The appellant told Washington to "go on with that. Get off my porch . ., my wife is here and my children and I don't want nothing like that." Washington then said, "Nigger, shoot me", and reached into his pants or under his shirt. The appellant then stated that he:
 ". . . stepped back and got my pistol from the closet and went back to the door. He reached again in his pants and said again, go on, Nigger and shoot me. I shot out the door once and quickly *Page 1366 
closed the wood door. I just wanted to scare him. I didn't even mean to hit him."
The appellant then stated that he turned out all the lights and looked out the front window. He saw Aaron Washington with a gun and shot one more time "in the ceiling or somewhere", "to scare them and let them know not to shoot in the house . . .". The appellant, in his statement said that he shot the deceased because he "thought he had a pistol when he said Nigger, shoot me, and reached in his pants". The appellant did not want to kill him and just "wanted to scare him or wound him". Further the appellant stated that his half-brother, Joel, had told him that Mrs. Sawyer liked him and wanted to go with him. The appellant felt like the Washington brothers were trying to tear up his home.
A state toxicologist, Dr. Richard Roper, performed a post-mortem examination upon the deceased. It was his opinion that death resulted from hemorrhage and shock associated with a single gunshot wound from a .22 caliber long rifle bullet which lodged in the upper portion of the deceased's chest. Dr. Roper did not undertake to determine what type of weapon (pistol or rifle) had fired the fatal bullet recovered from the deceased's body but stated that it could have been a .22 caliber pistol.
 I
During the prosecutor's cross examination of the appellant, the following exchange was had:
 "Q. Let me ask you this. Do you have a son by the name of Tracy Harris?
"A. Sure do.
"Q. How old is he?
"A. Tracy is about ten.
 "Q. Do you know whether or not Tracy gave the police a statement down at the Police Department?
"MR. ALLEN: Now, we object to that.
"Q. Was Tracy taken to Police Headquarters?
"A. I guess he was.
 "Q. Do you know whether or not he gave a statement down there?
"A. I don't know, sir.
 "Q. Okay. Before you shot Harold was Harold getting ready to leave your door?
"A. No, sir, he wasn't.
 "Q. So if your son, Tracy said that he was, he would be lying?
"A. Tracy would be lying.
"Q. Where was Tracy when the shot was fired?
"A. Eating dinner, sir.
 "Q. And if Tracy said he was in the living room he would be telling something that is not true?
"A. To my knowledge he would.
"Q. Well, was he in the living room or not?
 "A. I just told you I was on the couch when the knock came on the door.
"Q. Do you know where Tracy was?
"A. He had to be in the kitchen eating.
 "Q. If Tracy said he was in the living room with you, it would not be true?
"A. No, it wouldn't.
 "Q. Okay. And if Tracy said that when Wayne came up to the door and was talking to you and you told him if you don't leave I am going to get my gun and start blowing, that would not be true?
 "A. That would be a lie, sir. I have taken this oath and I am swearing the truth.
 "Q. Is that true or not, would Tracy be telling something untrue?
"A. Tracy would be lying.
"Q. Your son?
"A. My son.
 "Q. And if Tracy said when Wayne went to run away that is when you shot him, that would not be true?
"A. My son didn't say that.
 "Q. I am asking you, Mr. Harris, if he said it would it be untrue?
"A. It would be untrue.
 "Q. Okay. And if Tracy said you fired two shots, that would be true, wouldn't it?
 "A. That would be true. I shot one out the door and one over Aaron's head. If I hadn't shot out there he would have shot *Page 1367 
in my house and might have hit my family and everything. I tried to shoot up over his head to scare him off.
 "Q. And if Tracy said that you shot Wayne because he was just bothering you while you were relaxing, that would be untrue?
"A. Tracy didn't say that.
 "Q. I am asking you if he said that would it be untrue?
"A. He didn't say that. It would be untrue.
"Q. It would be untrue?
"A. It would be untrue."
At another juncture in the questioning, the prosecutor cross examined the appellant in regard to statements allegedly made by the appellant's older son on what the appellant had purportedly told his wife regarding bond and getting out of jail. No objection of any form was made to this second series of questions.
The appellant contends that the prosecutor's highly improper attempts to impeach the defendant's credibility by interrogating him regarding material details of a statement purportedly given by his ten-year old son to police investigating the homicide unconstitutionally denied the appellant his right to confront the witness against him.
There is no doubt and we have so held that questions of this type are hearsay and are prejudicial. Madison v. State,55 Ala. App. 634, 318 So.2d 329, cert. denied, 294 Ala. 764,318 So.2d 337 (1975). Holt v. State, Ala.Cr.App., 347 So.2d 536; writ of certiorari to the Alabama Supreme Court granted February 9, 1977, Ala.Cr.App., 343 So.2d 582. The question in this case then becomes whether there was a proper presentation and reservation in the lower court of error and the grounds of review.
Title 15, § 389, Code of Alabama 1940, requires that this court must "consider all questions apparent on the record or reserved by bill of exception (now transcript of the evidence) and must render such judgment as the law demands". This statute does not mean that in a case of this kind a review will be made of questions which were not properly raised in the trial court.Kendrick v. State, 55 Ala. App. 11, 312 So.2d 583 (1975) and cases cited at 55 Ala. App. 17, 312 So.2d 583; 7 Alabama Digest, Criminal Law, 1028. Review on appeal is limited to a consideration of questions properly raised in the trial court.Knox v. State, 38 Ala. App. 482, 87 So.2d 671 (1956); Handley v.State, 214 Ala. 172, 106 So. 692 (1926). Matters not objected to in the trial court cannot be considered for the first time on appeal since review on appeal is limited to those matters on which rulings are invoked at nisi prius. Daniels v. State,53 Ala. App. 666, 303 So.2d 166 (1974); Shiver v. State,49 Ala. App. 615, 274 So.2d 644 (1973); Cooper v. State, Ala. App.,331 So.2d 752, cert. denied, Ala., 331 So.2d 759 (1976). Even constitutional rights have to be raised seasonably in the trial court in order to be considered on appeal. Fuller v. State,269 Ala. 312, 113 So.2d 153 (1959); Steele v. State, 289 Ala. 186,266 So.2d 746 (1972).
The only objection made by defense counsel during the complained-of portions of the prosecutor's cross examination of the appellant was to the question, "Do you know whether or not Tracy gave the police a statement down at the Police Department?" Although defense counsel objected, this question was proper and the objection was due to be overruled. However, no ruling by the trial court was made on this objection. No further objections appear in the record. Likewise, there was neither a motion to strike nor a request for a mistrial. Therefore this court is precluded from reviewing this matter. The plain error doctrine applies only to death cases. Stinsonv. State, 56 Ala. App. 312, 321 So.2d 277 (1975). The jurisdiction of the Court of Appeals is appellate only, and its review is limited to matters upon which action or ruling at nisi prius was invoked. Fuller v. State, 38 Ala. App. 493,90 So.2d 244, cert. denied, 265 Ala. 695, 90 So.2d 245 (1956). Even those matters which result in "ineradicable harm" must at least be called to the attention of this court by a motion for a *Page 1368 
new trial. Alday v. State, 42 Ala. App. 21, 151 So.2d 220, cert. denied, 274 Ala. 718, 151 So.2d 225 (1962). Here an oral motion for a new trial and for the verdict to be set aside merely asserted that "the verdict is contrary to the law and evidence in this case." The trial court will not be put in error for the admission of the complained-of testimony, despite its objectionable character, where no objection was interposed.
 II
The appellant's second contention is that the evidence was not sufficient to support a conviction for second-degree murder. Specifically, the appellant contends that the state failed to fulfill its burden of proof regarding malice and did not undermine or contradict the self defense proved by the appellant.
The appellant's use of the pistol was sufficient evidence to warrant the jury's finding that he acted with malice. Holcey v.State, 52 Ala. App. 664, 296 So.2d 750, cert. denied, 292 Ala. 723, 296 So.2d 753 (1974). In finding the existence of malice, the jury may consider any matter coming to their attention,Madison v. State, 55 Ala. App. 634, 318 So.2d 329, cert. denied,294 Ala. 764, 318 So.2d 337 (1975), including the fact that the appellant went to his closet and retrieved his pistol before he shot the deceased and the appellant's own testimony that he did not intend to wound or hit the deceased but only shot to warn him. The fact that the appellant denied he intentionally shot the deceased presented a question for the jury. Harris v.State, 48 Ala. App. 723, 267 So.2d 512 (1972); Jones v. State,13 Ala. App. 10, 68 So. 690 (1915). Here the question of malice was properly for the jury.
Additionally, the appellant urges that the state did not contradict the appellant's showing of self defense.
The appellant was the only witness for the defense. He alone testified that he acted in self defense. This was a question for the jury. Moore v. State, 54 Ala. App. 22, 304 So.2d 263, cert. denied, 293 Ala. 768, 304 So.2d 268 (1974); Wall v.State, 49 Ala. App. 285, 270 So.2d 831 (1972). After the state adduces sufficient evidence to make out a prima facie case of homicide, for the defendant to be entitled to an acquittal on a plea of self defense, he must offer evidence which, when considered with all the other evidence, will produce in the minds of the jury a reasonable doubt as to his guilt. Key v.State, 47 Ala. App. 692, 260 So.2d 422 (1972); Lester v. State,270 Ala. 631, 121 So.2d 110 (1960). Whether or not the appellant was justified in killing the deceased was, under the evidence, for the jury to determine. The evidence was sufficient to support the conviction.
We have carefully reviewed the entire record in this case and find no reversible error. The judgment of the trial court is therefore due to be and is hereby
AFFIRMED.
All Judges concur.