304 So.2d 263

**William Earl MOORE**

v.

**STATE.**

**8 Div. 377.**

Court of Criminal Appeals of Alabama.

Oct. 1, 1974.

Rehearing Denied Oct. 29, 1974.

William J. Baxley, Atty. Gen. and John S. Andrews, Asst. Atty. Gen., for the State.

W. J. HARALSON, Supernumerary Circuit Judge.

The appellant was charged with first degree murder. He was convicted of murder in the second degree and sentenced to twenty-five years imprisonment.

The testimony is voluminous, but we think a succinct statement thereof will be sufficient upon which to base our conclusions of law hereinafter set out.

On March 16, 1971, the appellant, with his family, lived in an apartment in a housing project on Mason Court in Huntsville, Alabama.

Sarah Fletcher, the mother of the deceased, A. T. Fletcher, Jr., lived in the same project across the street from appellant. Leon Moore, a brother of Sarah Fletcher, lived in her apartment.

During most of the day of March 16, 1971, the deceased had been in the compa-

Benjamin E. Pool, Montgomery, for appellant.

ny of Sammie Moore, Esmore Turner, Leon Moore, and for part of the day Larry Lacy had joined the group. These persons were used as witnesses in the case. It appears that later in the afternoon, Leon Moore came to appellant's apartment and told him that Sarah Fletcher wanted to see him in her apartment. In a few moments, appellant went over to the apartment. He was told Sarah had not sent for him but that Leon, acting upon the request of A. T. Fletcher, Jr., had told him that Sarah wished to see him in order to get him to the apartment. Testimony was presented showing there had been previous difficulty on March 13, 1971, between A. T. Fletcher, Jr. and appellant, and that there was bad feeling between the two. In a few moments the appellant and Fletcher got into a scuffle, which was broken up by members of the family and several of the above-named friends of deceased. Shortly thereafter another scuffle broke out between the two, and it also was stopped by the other people present.

At this time, appellant left and the state's testimony shows that he told the deceased that if he put his hands on him or whipped him again, he would kill him or words to that effect.

Immediately after leaving Sarah Fletcher's apartment, appellant went to a sporting goods house, bought a shotgun and shells, and brought them back to his apartment. Later in the evening, around 9:30 p.m., the appellant's daughter came in from a neighbor's apartment, where she had been baby-sitting, and told appellant and his wife that the deceased and Leon Moore had come into the apartment and that she had run out of the back door and come home. The appellant procured his shotgun, loaded it, and went to his front door where he observed the deceased and Leon Moore coming from the apartment where the daughter had been baby-sitting. They were walking in the general direction of the small front porch to the appellant's apartment. After a few words were passed, three shots were fired by appellant, two of which were at close range, inflicting fatal wounds.

The state's testimony is that appellant said, "I told you that I was going to get you." The appellant's version was that he said to the deceased, "A. T., you done ran over me. Why you trying to run over the children?", and further said, "Do you know what you told me?", and A. T. replied, "Yes, Man, I know what I told you."

The deceased staggered several feet before falling to the ground, where he was later picked up by an ambulance and taken to a hospital although he was apparently dead at the time.

■ As the ambulance was loading the body of the deceased, two police officers arrived on the scene and began to investigate the surrounding circumstances. Appellant claims he had called the police. They talked with several bystanders including Sarah Fletcher who advised Officer Little that the appellant had fired the shots that killed her son. She accompanied the two officers to the apartment where appellant was standing just inside the screen door, the solid or permanent door being opened. As the officers approached, Officer Little saw through the screen door that appellant was standing just inside with the shotgun in his hand, and he invited them to come in. The officer drew his gun but testified that he kept it in his hand by his side, which was apparently out of view of the appellant. As the officers and Sarah Fletcher entered, she again pointed to the appellant and stated he was the man who had done the shooting. The appellant, as they came in, handed the shotgun to Officer Little who in turn asked him if he had done the shooting. He replied that he had shot the deceased, and that he would shoot him again. He was then arrested and taken into custody by the two police officers and held until the detectives arrived. They took him to headquarters in a squad car. He was not given the Miranda rights until

after he was arrested and after he had been turned over to the detectives and was either on his way to jail or had reached the jail.

Appellant urges a reversal on several grounds, the chief one of which seems to be that there was error on the part of the court in allowing, over timely objection of the appellant, his testimony to the police officer which was in substance that he had shot the deceased and would shoot him again. Appellant urges that the failure of the police officers to advise appellant of his Miranda rights before his statement with regard to the shooting was a clear violation of his constitutional rights and of the procedure laid down in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694.

We quote portions from the above cited case of *Miranda*, supra, which we think are pertinent to the issues in this case:

"More specifically, we deal with the admissibility of statements obtained from an individual who is subjected to custodial police interrogation and the necessity for procedures which assure that the individual is accorded his privilege under the Fifth Amendment to the Constitution not to be compelled to incriminate himself . . . By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way . . . The constitutional issue we decide in each of these cases is the admissibility of statements obtained from a defendant questioned while in custody or otherwise deprived of his freedom of action in any significant way. In each, the defendant was questioned by police officers, detectives, or a prosecuting attorney in a room in which he was cut off from the outside world . . . To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning the privi-

lege against self-incrimination is jeopardized."

The interrogation by the police officer and appellant's answer were admittedly before the appellant was arrested or taken into custody. Insofar as the evidence shows, the appellant at the time was not deprived of his freedom of action in any significant way. The further question then arises, had the investigation focused upon the appellant as being the person guilty of the crime? We think this is a matter that would have to be determined by the circumstances of each particular case. We are not in a position to say whether the police at the time would have prevented the appellant from moving around in his home or outside or would have held him or made an arrest upon the statement of the woman who had made the accusation. Of course, immediately after the appellant's statement he was arrested and held until the detectives arrived. Appellant relies heavily upon Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311. That case, however, may be distinguished from the facts in the present case especially in that Orozco, the defendant, was under arrest and was being questioned by four policemen in his bedroom. Of course, he was entitled to the Miranda warning since he was in actual custody. Under the facts in the present case, we are not ready to affirm that the appellant at the time of the statement was actually deprived of his freedom of action in any significant way nor had the investigation progressed beyond the investigatorial stage to the accusatorial stage. It is significant that the accusation against the appellant at the time had not been made by the officers who had been invited into his home. See Veith v. State, 48 Ala.App. 688, 267 So.2d 480, and Bedingfield v. State, 47 Ala.App. 677, 260 So.2d 408.

We have found no case exactly in factual point with this case. We think, however, that the principle laid down in Truex v. State, 282 Ala. 191, 210 So.2d 424, is applicable here, even though in *Truex* there

was no accusation made by anyone against the defendant.[1]

■ At the request of the state, the court gave the following written charge:

"The court charges the jury that you cannot find the defendant not guilty by reason of self defense."

Many charges in writing requested by the appellant, on the theory of self-defense, were refused by the court.

The appellant testifying with regard to the circumstances surrounding the shooting contended in substance that his stepdaughter came running into his house just before the shooting and said that A. T. (the deceased) had run them out of the house where she had been baby-sitting; that he went to the door and stuck his head out and saw the deceased was just leaving the apartment next door; that he asked the deceased why he ran over the children like that; that at this time Fletcher was standing on the concrete porch or steps to the apartment next door; that he put his hand in his pocket and started toward the appellant cursing; that appellant reached inside the door for his gun and fired one time into the ground; that he was about halfway between the two porches of the apartments when appellant fired the first shot; that he continued to move toward appellant who had told him to stop when he fired the first shot; and that the appellant then fired the other shots.

The pictures of the apartments occupied by these parties show the porches separating them were relatively close, and according to appellant's testimony, the deceased was only a few feet away.

The appellant had also testified that in a former difficulty between the two he had been cut with a knife by the deceased, and at another time he had pulled a pistol from his pocket and struck appellant on the head.

Under the circumstances we cannot say that there was no evidence of self-defense presented. This being so it was the duty of the court to charge upon self-defense and leave the weight of the testimony for the jury's consideration.

The prevailing rule with regard to establishment of justification by reason of self-defense is set out in Lester v. State, 40 Ala.App. 503, 121 So.2d 107, as follows:

"'* * * it is now definitely settled that the rule as to the burden resting on a defendant where he relies on self-defense as a justification is that he must only offer such evidence as will, when considered with the whole evidence, generate in the minds of the jury a reasonable doubt of his guilt. Baker v. State, 19 Ala.App. 432, 98 So. 213; Barbaree v. State, 24 Ala.App. 127, 130 So. 903; Lee v. State, 24 Ala.App. 168, 132 So. 61.'"

■ The weight and credence given the testimony, of course, is a question for the jury. Smith v. State, 15 Ala.App. 662, 74 So. 755; Oliver v. State, 30 Ala.App. 311, 5 So.2d 642.

It is further the duty of the court, where such evidence is present, to charge on the law of self-defense. McMichen v. State, 34 Ala.App. 300, 39 So.2d 47. Accordingly, we think it was the duty of the court to charge on the elements of self-defense applicable under the evidence offered.

It follows that the giving of the above charge for the state, excluding from the jury a consideration of the question of self-defense, was error on the part of the court. It is not necessary to comment on the several charges on self-defense requested by appellant and refused by the court.

We do not think it necessary to consider other questions raised on this appeal since the matters dealt with may be considered as decisive of the main issues raised. We

1. As to interpretation of certain phases of Miranda holdings, above dealt with, see 10 A.L.R. 30, 1054(3).

doubt that most of these matters will arise on another trial of this case.

For the error above pointed out, the case is reversed and remanded.

The foregoing opinion was prepared by Honorable W. J. HARALSON, Supernumerary Circuit Judge, serving as a Judge of this Court under § 2 of Act No. 288, Acts of Alabama, July 7, 1945, as amended; his opinion is hereby adopted as that of the Court.

The judgment below is hereby

Reversed and remanded.

ALMON, TYSON, HARRIS and De-CARLO, JJ., concur.

CATES, P. J., not sitting.