Appellant was indicted for murder in the first degree and the jury found him guilty of murder in the second degree and fixed his punishment at 35 years in the penitentiary. Prior to arraignment and trial appellant was found to be indigent and counsel was appointed to represent him. He pleaded not guilty and not guilty by reason of insanity. After sentence was imposed he gave notice of appeal and was furnished a free transcript. Trial counsel was appointed to represent appellant on appeal.
The evidence was in sharp conflict in many respects. The State produced an eyewitness to the shooting of the deceased in his own home by appellant with a sawed-off shotgun. Appellant's version as to the circumstances that preceded and led up to the shooting was at variance with the State's eyewitness in some degree.
There was no motion to exclude the State's evidence; there was no request for the affirmative charge, and no exceptions were reserved to the Court's oral charge to the jury. Appellant did file a motion for a new trial in which he questioned the sufficiency of the evidence but no testimony was taken on this motion and the motion was overruled and denied. The motion also raised the refusal of the trial court to give at the request of appellant a number of charges on the law of self-defense.
This two-volume record covers more than 400 pages and we see little need to detail the testimony of all the witnesses. We feel that a condensed recital of the testimony of the State's eyewitness and appellant's testimony will serve to point up the major issues presented on this appeal.
On August 23, 1975, appellant and five or six other men came to Lawrence County from Limestone County in search of a man named "Tex" who they thought had stolen *Page 82 
some tools and some rare coins that belonged to one of the men. While in Lawrence County, they decided to go to the home of Rita Ferguson and Bessie Jones who were "go go" girls at a nightclub. When they entered this home, one of the girls was holding a shotgun and Bessie Jones had blood on her face. The girls told the boys that the deceased had come to their house and beat them up and generally tore up the house as there was broken glass all over the living room and the floor was wet. They told the men that the deceased threatened to come back later and give them some more of the same. The men decided to take matters into their own hands and go to the home of the deceased as they saw no reason for anyone to beat up the girls and tear up their home. The girls went with them to show them where the deceased lived. The time was around 7:00 p.m. on August 23, 1975. Just before the men and girls drove up to the home of the deceased, the deceased and his friend Tommy Mackey went to the home of the deceased's grandmother to make a telephone call.
According to the testimony of Tommy Bruce Mackey, who lived with the deceased and they had been close friends for six years, after the deceased had made the telephone call and they were walking back home, a car pulled into the driveway of the deceased. Someone in this car called the deceased and he went over to the car. Mackey stated that he went in the home of the deceased where he saw the appellant standing inside the house next to the wall of the living room holding a shotgun. The deceased came stumbling backwards through the front door into the room. When Mackey first entered the room, the man who was holding the shotgun pointed the gun at him and ordered him to sit in a chair next to a couch. As soon as the deceased entered the room, he saw the man with the shotgun and approached him to take the shotgun and as he grabbed the gun, it discharged and the load went into the floor of the living room. At this point one of the other men struck the deceased, knocking him to the floor and began to beat on him. Appellant was the man with the shotgun. The deceased was pretty well intoxicated and after he was knocked to the floor, he was subdued. The man who knocked him to the floor picked him up and put him on the couch.
About this time several of the other men and the two girls entered the room and there was some talk about previous difficulties concerning the girls. Mackey stated that during this conversation appellant had the shotgun pointed at the deceased. Mackey told the girls to tell the men that he was not involved in any difficulties with them. The deceased was still sitting on the couch and he told appellant to put the gun up and there was no need or use for the gun. The man who knocked the deceased to the floor was standing between him and appellant and he could not see the shotgun though he could see the deceased still sitting on the couch. He heard someone say, "Don't shoot," and the gun fired and the load struck the deceased in the upper left chest and he fell backward on the couch. The girls started screaming and they all left the house immediately. Mackey waited until he heard the car leave and he went to the deceased's grandmother's house and called the officers.
Ernest Knox, Deputy Sheriff of Limestone County, arrested the defendant at his uncle's house. Mr. Knox testified that he had a murder warrant for appellant's arrest and had been looking for him for two days all over Limestone County. He further stated that before he could ask appellant a single question, he stated, "Mr. Knox, I have messed up. I have killed a man down in Lawrence County." A shotgun in the possession of appellant was identified by him as the same gun he brought back from Lawrence County.
Mr. J.D. Ferguson, the father of Rita Ferguson, testified that the shotgun was his. He stated that he owned two shotguns, a regular Magnum Browning and a Buck Special. He said the guns were supposed to be at his place and he did not take the gun anywhere that day. He further testified that he saw his daughter, Rita, *Page 83 
shortly after 12 o'clock noon on August 23, 1975, and she was upset and excited. He stated that her companion, Bessie Jones, was bruised and bleeding. He went to his daughter's house and there was broken glass and water all over the floor.
Mrs. Elaine Scott, a member of the State Toxicology Department, testified that she ran a blood test on a blood sample taken from the body of the deceased and the alcoholic content showed it was .26 percent.
John H. Kilburn, also with the State Department of Toxicology, testified that he ran tests on the weapon shown as State's Exhibit 1, and the shells found at the scene of the crime. He found that one shell was not fired from the weapon and the other shell was possibly fired from the weapon.
Appellant testified that on August 23, 1975, he and five other men came from Limestone County to Lawrence County looking for the house of two girls they had met. All of the men had been drinking beer but they were not drunk. They found the house and it had been torn up and one of the girls had been beaten. One of the girls had a shotgun. The girls accused the deceased of the beating and the destruction. They decided to go talk to the deceased. He denied pointing the gun at anyone. He stated that the deceased grabbed the gun both times that he fired and that the gun was pointed toward the floor. He further testified that the deceased appeared to be drunk and that he did not see a weapon of any kind in the hands of the deceased or near him. He stated he had met the deceased one time but that he had never bothered him.
On cross-examination he identified State's Exhibit No. 8 as being his gun. It was a 20 gauge sawed-off shotgun that he brought to Lawrence County with him. He further stated that when he got out of the car on the passenger side in the driveway of the home of the deceased, someone handed him a shotgun and he carried this gun into the deceased's home. He said when everyone was getting out of the car he was handed a shotgun and that he didn't want anything to do with the matter. He was asked if he did not want to be involved why didn't he hand the gun back and he said, "I can't answer that, I don't know." Appellant first stated that he didn't know the gun was loaded but after it was shot into the floor he knew it was loaded, but he did not try to leave the house then. He just stood there holding the gun up when the gun went off. That when the deceased grabbed the gun, the second time, he did not reach for the trigger as appellant was holding that part of the gun.
Appellant further testified that he had his finger on the trigger when the gun went off and he shot the deceased in his own house.
The Coroner of Lawrence County came to the shooting scene and found the deceased dead on the couch where he had been shot.
An autopsy was performed and six buckshot were removed from the body of the deceased and these shot severed the spinal cord. Death was immediate.
The statement made by appellant to the Deputy who came to arrest him that he had messed up and had killed a man in Lawrence County was properly admitted as a "spontaneous exclamation." The arresting officer had not addressed a single remark to appellant before he made this statement. Veith v. State, 48 Ala. App. 688,267 So.2d 480; Moore v. State, 54 Ala. App. 22, 304 So.2d 263;Osner v. State, 54 Ala. App. 520, 310 So.2d 241; Bedingfield v.State, 47 Ala. App. 677, 260 So.2d 408.
The law does not prohibit the trial judge from giving trial counsel his reasons in making certain rulings as to the law applicable to the case. This falls far short of a comment on the evidence. Bedingfield v. State, supra.
In 23 C.J.S. Criminal Law § 993, p. 1024, it is said, "Generally, it is not improper comment on the evidence for the judge to explain his ruling on a matter of law, and he may refer to testimony and state its legal effect, in deciding a point raised during the trial." *Page 84 
Where the accused claims the shooting was in self-defense, the onus rests on him to show that he could not safely retreat without increasing or apparently increasing his peril. Cosby v.State, 269 Ala. 501, 114 So.2d 250; Payne v. State, 48 Ala. App. 401, 265 So.2d 185.
To excuse one charged with murder on the ground of self-defense the accused must neither have provoked nor encouraged the difficulty, and must at the time have been, or appeared to be, so menaced as to create a reasonable apprehension of loss of life or grievous bodily harm, and there must have been no other reasonable mode of escape. Alabama Digest, Homicide, 109 et seq.
The killing in this case would be more appropriately termed an assassination than a murder case in the usual sense. Appellant shot and killed a drunk, unarmed and defenseless man in his own home. He and five other men left their homes in Limestone County and went to Lawrence County where they invaded the home of the deceased and appellant shot him with buckshot as he was sitting on a couch. There is not one thread, glimmer or scintilla of evidence that the deceased was making an attack on appellant when he fired the shot that killed him. This is evident from the State's eyewitness and the testimony of appellant himself. Appellant was the only person in the house at the time who had a weapon and he could have walked out of the house any time he chose.
We hold that the trial court properly refused all requested charges dealing with self-defense.
There was no error in the introduction into evidence of the sawed-off shotgun appellant carried from Limestone County to Lawrence County even though it was not the gun actually used in killing the deceased. It tended to prove that appellant came to Lawrence County on a mission that cannot be said to be a friendly visit. Morris v. State, 268 Ala. 60, 104 So.2d 810; Gautney v.State, 46 Ala. App. 102, 238 So.2d 900; Walton v. State,54 Ala. App. 317, 307 So.2d 713.
We have carefully searched the record for errors which injuriously affected the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.