The grand jury of Montgomery County charged that Clarence Washington: ". . unlawfully and with malice aforethought, killed Jessie Price by shooting him with a pistol. . . ." Trial was held and a jury found him guilty of murder in the second degree and fixed his punishment at ten years in the penitentiary.
Richard A. Roper was employed by the Alabama Department of Toxicology and Criminal Investigation as a toxicologist and the director of the Montgomery laboratory. After September 12, 1975, he conducted a post mortem examination of the body of the victim, Jessie Price. His examination revealed two circular penetrating wounds on the body; one located in the upper chest and the other in the right hip. Based on that examination, his conclusion was that death resulted from hemorrhage and shock associated with a gunshot wound to the chest.
On cross-examination, Dr. Roper stated that the victim was approximately six feet, two inches tall and weighed about two-hundred pounds. In Roper's opinion he was not obese and had a normal muscular development. Roper stated that while he was at the funeral home, Herman Singleton, the mortician, gave him a sample of blood from the deceased. He said the analysis of the blood indicated that ethyl alcohol was not present.
Charles Wesley Smith, a criminalist with the Alabama Department of Toxicology in Montgomery, testified that he made a firearms comparison test with the alleged murder weapon which he received from the Montgomery detective's office. He compared the bullet retrieved during the test with that found in the victim's body and it was his opinion that they were fired from the same gun.
During cross-examination, Smith stated that on October 8, 1975, he received the pistol used in the test from Detective Brannon and that the weapon had the officer's initials scratched on it.
Mattie Evans lived at 155 Phillips Street in Montgomery, Alabama, and the appellant, Clarence Washington, was her nephew. She testified that she had reared Jessie Price and that on the night in question, Price had asked her to buy some juice "for the little girl" who lived across the street. He also asked her to buy some cigarettes and beer. At that time he gave her what she thought was a twenty-dollar bill. She placed the bill in the bottom of her pocketbook and went to the store. Upon returning, Mrs. Evans learned that Price had gone "up the street." She then asked Price's cousin, Roy Edwards, to take her to church and on her return, "heard" Price across the street. Mrs. Evans called to him and was told to leave the cigarettes with her son, Albert, and that Price would get his change and beer later. Subsequently Price came to her house and while he was sitting on the front porch, she gave him the change. About that time, Price asked her to give Houston Hardy and Jesse Lige a beer. When she reached the kitchen, Price called her back to the porch and said: "my change ain't right." She started to explain about the cost of the items and Price said: "no, I don't mean that . . . I mean I gave you a fifty-dollar bill instead of a twenty." At that point a discussion concerning the money began and Price telephoned his sister, to whom he had also given money.
Mrs. Evans testified that at the close of Price's telephone conversation with his sister, he began to "cuss and stomp." About that time, the appellant, Clarence Washington, came into the house and he and her son, Albert, began to argue with Price. They went onto the front porch and when Albert was pushed back into the house, the appellant turned and walked off the porch. When the appellant reached the corner of the porch he came back to the front of the house and shot Price. Mrs. Evans stated *Page 613 
that she did not see the victim with a weapon at the time and that she had just helped him to his feet when he was shot. After the second shot she stepped in front of Price and the appellant stopped shooting. According to Mrs. Evans, she had never known Price to carry a gun or a knife.
Roy Edwards, the victim's first cousin, testified that on the night in question, he saw the victim drinking beer on the front porch of the house across the street from where the Evans' house was located. He recalled that when Mattie Evans came home from church, she came over and asked Price if he wanted his money. Price told her that he would come over and get it and she went home. After Edwards saw Price go to the Evans' house, he heard some loud talking coming from the Evans' front porch. He was about fifty feet away at the time when he saw the appellant grab Price. They began pushing one another and Price went down. Edwards testified that when he went over, the appellant had Price down beating him. According to Edwards, he broke up the fight and was talking to Price when the appellant stepped up, pulled a gun from his back pocket, cocked it and shot twice. He said that Price was not moving toward the defendant and did not have any kind of weapon.
Jesse Lige lived at 148 Phillips Street, which was across from Mattie Evans' house. On the night of September 12, 1975, he was sitting on his front porch with Houston Hardy when Jessie Price came to his house. Lige recalled that Price had asked Hardy and him to go over to Mattie Evans' house. He said that after they walked in the back door, Price asked Mrs. Evans for his change and she said: "I don't owe you no change." Price claimed he had given Mattie Evans a fifty-dollar bill but she insisted it was a twenty-dollar bill. Lige said an argument developed and Albert Evans awoke and started arguing with Price. A fight ensued and subsequently they moved to the front porch. According to Lige, Clarence Washington, the appellant, came over and he and Albert started "double teaming" Price on the front porch. When Albert was pulled away, the appellant and Price continued to fight but Roy Edwards came over and pulled the appellant off of Price. At that point, the appellant went around the side of the house and then came back to the front steps and started shooting.
During cross-examination, Lige stated that he was sober that night and that he did not see Price or appellant drinking. He admitted being invited over to the Evans' house to have a beer but said that Price did not drink any while he was there. Lige said he did not hear Price or the appellant "cuss" but did hear Albert use some profanity. On further questioning, he stated that when the appellant pointed the gun at Price, Price "put his hands up."
On the evening of Friday, September 12th, Houston Hardy was visiting in the home of Jesse Lige and sometime after 5:00 P.M. they walked across the street to Mattie Evans' house. About the same time she came home from church and when Hardy and Lige went in the back door of the Evans' house, he heard Price and Mrs. Evans arguing about a fifty-dollar bill. After Hardy and Lige went into the front room, they saw Albert, Mattie Evans' son, shaking money in Price's face and arguing that he did not get Price's money. Hardy testified that after Price had made a telephone call to his mother, he asked Price to go outside. When they went outside the door, Washington pushed Price and then Albert got involved. According to Hardy, he pulled Albert away from Price and the appellant pushed Price over a porch chair. At that point, Price grabbed Washington and they came up from the porch floor together. When Price went down the second time, Edwards who was across the street came over and he and Mattie Evans broke up the fight. After Washington got off the side of the porch he walked around to the front steps of the house. Hardy testified that the appellant ". . . came out of his pocket with a pistol and he shot once." Price did not move after the first shot but after the second shot, fell backwards toward the door of the house. According to Hardy, the appellant put the gun in his pocket and said *Page 614 
he was going inside the house to telephone the police.
During cross-examination, Hardy said he did not see anybody drinking alcoholic beverages that night but said he heard Price "cussing" when he accused Mattie Evans of taking his money.
Jack Stewart was an officer of the Montgomery Police Department and on September 12, 1975, he went to the scene of the shooting. On his arrival he observed the deceased lying on the front porch and afterwards removed a .25 caliber automatic pistol from the appellant's pocket. Stewart testified that he gave the pistol to Corporal Spiers, who unloaded the weapon and gave it back to him. According to Stewart he kept the weapon in his possession until the detectives arrived; he then turned it over to Officer Brannon.
Corporal R.L. Spiers of the Montgomery Police Department testified he went to the scene of the shooting. While there Spiers unloaded the alleged murder weapon and returned it to Officer Stewart.
C.H. Brannon was a detective of the Montgomery Police Department and on the night in question he went to the scene of the shooting. He identified a .25 caliber automatic pistol which he had inscribed with his initials and the date, "9/12/75." He testified that Officer Stewart had taken the pistol from the appellant and had turned it over to him. According to Brannon he placed the pistol in his pocket and on return to the police headquarters, he turned it in to the supply office. Brannon said he subsequently took it from the supply office to the State Department of Toxicology.
The State completed its case at the end of Officer Brannon's testimony and the appellant was the only defense witness.
Washington testified that he went to his aunt Mattie Evans' house at 4 or 5:00 P.M. on September 12, 1975 and that Price and Albert Evans were on the porch drinking. They had been drinking beer and gin and in a short time Albert went to bed. Washington and Price stayed on the porch talking until his aunt returned. It was after he and Price helped bring in the groceries that she came out and give him Price's change. When appellant gave Price the change, he said: "`Clarence, that ain't right' . . . `I gave Mattie Lilla a fifty-dollar bill' . . ." At that point Washington went in the house and called his aunt. When she came to the front porch they began to argue. She claimed that Price did not give her a fifty-dollar bill. According to appellant, Price and his aunt continued arguing and subsequently Price said, "Let's go wake Albert up. Albert knows what I gave her." At that time appellant left and went next door where he remained until he heard what he thought was "something like a fight." He returned to the Evans' house and saw Albert Evans and Price fighting. He attempted to stop the fight and he and Price started tussling. Appellant testified that it was about that time that Roy Edwards came over and held him, while Price hit him. Washington maintained that during the struggle he fell off the porch and when he returned to the porch steps, he heard Edwards say: "Don't worry man, we'll get him." Appellant testified that Price and Edwards were coming towards him and that Price had his hand in his pocket. Washington said: ". . . I didn't know what he had, so I shot. I shot once, and that's the only shot that I remembered, and I call myself just shooting to scare him, to scare him back. And then after I had seen I had hit him, I went and called the police."
On cross-examination, appellant said that he had never had any trouble with Price before and never knew him to carry a pistol. Washington said that he had never seen Price in a fight and did not know whether or not he carried a knife.
 I
The appellant contends that the State failed to trace the chain of custody of the alleged murder weapon with sufficient completeness so as to render it improbable that it had either been exchanged or altered. He argues that the State did not show that the pistol was under "lock and key" and did *Page 615 
not rule out the possibility that the gun barrel could have been changed. Counsel insists that without such proof, a complete chain of evidence was not shown for the introduction of the weapon and that its admission was improper.
Before a physical object connected with a commission of a crime may properly be admitted in evidence there must be a showing that such object is not only the same one, but is in substantially the same condition as when the crime was committed. In making this determination, the trial judge should consider the nature of the article and the circumstances surrounding its preservation and custody. If, upon the consideration of such factors, the trial judge is satisfied that identification and continuity of possession were sufficiently established to afford ample assurance of the authenticity of the article, then he may permit its introduction. Powell v. State, 47 Ala. App. 582, 258 So.2d 923;Oury v. State, 53 Ala. App. 240, 298 So.2d 661.
In our review of the record in the instant case, and the evidence recited above, we found:
1) Officer Stewart took the murder weapon from the appellant and then handed it to Corporal Spiers to unload.
2) Spiers removed the clip and then returned the clip and the weapon to Stewart.
3) Stewart kept the weapon in his possession until the detectives arrived and then turned it over to Officer Brannon.
4) After taking the weapon from Stewart, Brannon inscribed his initials and the date on it and then placed it in his pocket. On his arrival at police headquarters, the weapon was turned in to the supply office and subsequently removed from the supply office by him and taken to the office of the State Department of Toxicology.
5) Officer Spiers identified the weapon and testified that it was in the same condition as it was when he returned it to Officer Stewart.
6) Detective Brannon also identified the weapon as the one he received on the night of the offense and pointed out the inscriptions he had made on it. Further, he testified it was in the same condition as it was at the time that Officer Stewart gave it to him.
Aside from the above, there seems to be no factual controversy as to the fact that the appellant did the shooting with the pistol introduced into evidence.
In our judgment, the evidence as to custody and possession was sufficient to afford ample assurance that the weapon received in the evidence was the one taken from the appellant.
 II
Finally, the appellant argues that his evidence made out a case of self defense and in his motion for a new trial, maintained that the verdict was contrary to the great preponderance of the evidence. Under the evidence presented, it was a question for the jury to determine whether the defendant was in imminent peril, used all reasonable avenues of escape, and shot to protect himself. Cooley v. State, 233 Ala. 407,171 So. 725; Ray v. State, 253 Ala. 329, 45 So.2d 4.
In determining this question, the jury was entitled to look at all the testimony offered by the State and the appellant. Even though the evidence of the appellant with regard to self defense may have been without dispute, which was not the case here, his credibility was for the jury. They may, in their discretion, have accepted it as true or rejected it. Cooley v.State, supra; Kemp v. State, 278 Ala. 637, 179 So.2d 762.
The trial judge set out the applicable rules of law pertaining to self defense in his oral charge to the jury, and the issue was resolved against the defendant. The evidence was sufficient to support the verdict and there was no error in overruling the motion for a new trial.
We examined the record and found no error.
AFFIRMED.
TYSON, HARRIS and BOOKOUT, JJ., concur. *Page 616