LEIGH M. CLARK, Retired Circuit Judge.
A jury found this appellant guilty on an indictment that charged in pertinent part that he “did recklessly cause the death of Rayburn Vess, by shooting him with a pistol, in violation of Section 13A-6-3 of the Code of Alabama.” The court fixed his punishment at imprisonment for ten years and a fine of $5,000.00 and sentenced him accordingly. He had previously been tried for the same incident made the basis of the indictment herein on an indictment charging him with murder. The result of that trial was a verdict finding him guilty of manslaughter and a judgment fixing the same punishment and imposing the same sentence as the judgment from which the instant appeal was taken. For an error in the admission of certain evidence, the former judgment was reversed and the cause remanded, as shown in Hill v. State, 394 So.2d 106 (Ala.Cr.App.1981).
We are not informed by the record proper or the transcript as to what happened to the indictment for murder, but it is obvious that there was no further effort by the State to prosecute the defendant for murder in view of appellant’s having been acquitted of murder by the verdict and judgment finding him guilty of manslaughter. Instead of proceeding under the first indictment, a new indictment was returned, as quoted above in pertinent part, about three months after the reversal in Hill v. State, supra. No question was raised on the trial, and no question is raised here, as to the validity of the proceeding under the second indictment instead of the first indictment.
According to the undisputed evidence in the case, about sundown on Saturday, May 31, 1980, the alleged victim was shot to death by a pistol in the hand of the defendant while both were on or near real property owned by defendant and while they were on or near a public highway. Whether they were on the right-of-way of the highway or on the property of defendant at the time was a hotly contested issue between the parties on the second trial as it was on the first trial. Much testimony was introduced on the subject, consisting largely of many pictures and drawings. We agree with appellant’s statement in his brief, “The issue of whether Vess [the alleged victim] was actually shot on Hill’s [appellant’s] property was a jury question.”
The undisputed evidence shows also that during a period of approximately twenty-four hours prior to the fatal altercation between defendant and the alleged victim, each of them had imbibed a large amount of whiskey or beer. They had encountered each other during that period, but most of the time they were in different areas from each other. Only one witness testified that he was in the area of the homicide at the time it occurred. However, he did not engage in the encounter and he was not in as good a position as the defendant to testify with accuracy as to the exact location of the defendant or the alleged victim immediate *1257 ly before and at the time the victim was shot. We summarize the defendant’s evidence by quoting from appellant’s brief as follows:
“According to Hill’s testimony, Vess pulled in his driveway [the driveway of Hill] got out of his truck, and urinated. Hill noted that he went to Vess and asked him ‘if he didn’t have no more respect for people than that;’ that he told Vess that women and children lived behind his [Hill’s] residence and that traffic passed by; that a man could get shot for doing things like urinating in public; that he told Vess to leave; and that Vess responded ‘To hell with you and your renters.’
“Hill testified that Vess then pulled into a driveway leading to Hill’s rental house; that Vess stopped his truck and leaned toward the glove compartment as though he were getting something; and that Vess then proceeded to turn onto County Road 19 but then pulled back into Hill’s driveway at a fast rate of speed, stopping so close to Hill that he had to move to avoid being hit.
“Hill testified that Vess then got out of the truck and stated that ‘You ain’t got the G— damned guts to shoot nobody;’ that Vess then rushed around the truck; that Hill told him to stop but Vess refused; that Hill remained stationary and shot two or three times as Vess came around the corner of the truck; that Vess was four to six feet away when Hill fired; that there was no muzzle contact; and that he stopped firing when Vess quit advancing on him. According to Hill, Vess’ face was distorted as though he were ‘half-crying or mad’ as he approached; and Hill never saw Vess’ hands, but that he believed from past experience that Vess was carrying a gun.
“Hill stated under oath that Vess grabbed his chest after he was shot; that Vess walked 12 or 15 feet to the other truck; and that he then put his hands against the truck and fell. Hill testified that he then unloaded his pistol and placed it under his mattress and made arrangements for the ambulance and Sheriff to come.”
Perhaps it should be said also that there was considerable testimony by defendant that he was in the “junk parts business” and also periodically sold alcoholic beverages from his residence, that he and Vess had had disagreements in the past, that eight or ten months before the fatal incident defendant and Vess had a confrontation over Vess’s use of foul language in Hill’s home, and that on said occasion Hill told Vess that he [Hill] was not able to fight and Hill proceeded to stay in the bathroom until Vess left. According to the defendant, he had been hospitalized several times for a heart condition and he could not handle heavy labor after his heart problem began and Mr. Vess knew the defendant had a heart condition. The contiguous real estate of the defendant that included or was adjacent to the place where defendant and the victim were at the time of the homicide consisted of defendant’s place of business, defendant’s residence and some apartments or a house that others were occupying as renters from defendant.
At the conclusion of the lengthy evidence introduced by the State, including the testimony of ten witnesses, defendant moved to exclude the evidence on the ground that it “failed to prove a prima facie case against this Defendant” and moved to exclude the evidence on the ground that there was “a fatal variance between the indictment and the evidence.” The court overruled each motion, and appellant contends that each ruling was erroneous.
Although, as previously indicated, we are somewhat puzzled with the course of the pleadings taken by the State by the return of a new indictment after the judgment of conviction and sentence on the first indictment had been reversed, we are unable to agree with appellant that a prima facie case was not presented as to the express charge of the indictment. The gist of appellant’s contention in this respect is to be found in his brief as follows:
“It is obvious from the facts that Hill did not shoot Vess ‘recklessly,’ but shot him *1258 intentionally, in self defense. ‘Intentionally’ is defined as follows: ‘A person acts intentionally with respect to a result or to conduct described by a statute defining an offense, when his purpose is to cause or to engage in that conduct.’ Ala.Code, § 13A-2-2(l) (1975).”
Appellant is not at fault for the anomaly now presented by him, i.e., that he, if guilty, was guilty of murder rather than manslaughter under Ala. Criminal Code, § 13A-6-3(a)(l). Nevertheless, we cannot agree with appellant’s contention that there was no evidence to support a finding that the homicide was committed “recklessly” instead of “intentionally.” We doubt not that the evidence shows without dispute that defendant “intentionally” shot the alleged victim, but the evidence was sufficient upon which to base a finding that defendant did not “intentionally” kill the alleged victim. Notwithstanding any anomaly, there was prima facie evidence of defendant’s guilt of the crime expressly charged in the indictment and there was no fatal variance between the indictment and the evidence. The court was not in error in overruling the defendant’s motions to the contrary.
A major contention for a reversal pertains to the admission in evidence of testimony of Dr. Harry Santeno, who was employed under contract with the state of Alabama, Department of Forensic Sciences, as to the external and internal autopsy performed by him upon the body of the alleged victim. According to Dr. Santeno, he had previously had occasion to perform post mortem examinations on about two thousand or twenty-five hundred bodies involving death from gunshot wounds. He said that on the left side of the temporal area of the head of Mr. Vess there was a bruise or contusion, a “second wound as an entrance of a gunshot wound that was a contact wound on the lateral — on the outer aspect of the left shoulder” and another gunshot wound in the left chest of Mr. Vess that went through his heart and was the wound that caused his death. Each was a .38 caliber bullet wound. Both bullets were recovered during the autopsy. Dr. Santeno described the gunshot wound of the shoulder as follows:
“That was — I have reported the second wound as an entrance of a gunshot wound that was a contact wound on the lateral — on the outer aspect of the left shoulder one and a half inches from the top of the shoulder and seven and a half inches to the left of the mid-line of the chest. This wound was jagged and was blackened inside with soot, and gave every criteria for a contact wound.
“Q. What is a contact wound, please sir?
“A. That’s a wound sustained with the muzzle pressed against the target.”
The issue presented by appellant as to the testimony of Dr. Santeno is stated in his brief as follows:
“Testimony by one not an expert in the use of firearms concerning the distance between the deceased and the gun at the time of firing is reversible error.”
Immediately after the statement of the particular issue, appellant argues in his brief:
“In the case sub judice, Dr. Santeno, a forensic pathologist, testified that one of the gunshot wounds inflicted on the deceased was a contact wound, i.e., ‘a wound sustained with the muzzle pressed against the target.’ (R. p. 211) Appellant respectfully submits that Dr. San-teno was not qualified to give such an opinion.”
Without determining whether Dr. Santeno was qualified to give such an opinion, we must note, as is shown by the previous quotation herein from Dr. Santeno’s testimony, that there was neither an objection to the question asked Dr. Santeno by State’s counsel, “What is a contact wound, please, sir?” nor a motion to exclude his answer, “That’s a wound sustained with the muzzle pressed against the target.” Thereafter, counsel for the State, not content as he should have been with the witness’s testimony on the subject, continued to question the witness along the same line, with the result that there were objections by defendant’s counsel and colloquies among the court and counsel for the respective *1259 parties. We quote the pertinent part of the remainder of the transcript on the subject, commencing with the next question asked by State’s counsel:
“Q. In other words, you are saying that the wound in the left shoulder, in your opinion as an expert and as a physician, and as a person performing a post mor-tem examination, that the shoulder wound was sustained by having the gun muzzle pressed up against the skin of Rayburn Vess?
“MR. ROGERS: We are going to object. He is not qualified to testify to this.
“MR. LITTRELL: Judge, I think he is.
“MR. ROGERS: We object.
“THE COURT: Well, I will sustain it as to the form of the question. You will just have to get into it in a direct manner.
“BY MR. LITTRELL
“Q. Describe the wound in detail, please, sir?
“A. The wound had no gunshot residue of any kind surrounding it. The wound was—
“Q. In other words, you are saying that there were no powder burn, like folks call them around the outside of the wound?
“MR. ROGERS: Now, we object, Your Honor, as to leading and clarifying. I believe the jury can understand what he is saying. He said no residue, gunshot residue.
“BY MR. LITTRELL
“Q. Can you describe residue as something else, doctor?
“A. I can.
“Q. Would you do so, please, sir?
“A. Residue is my term for any material that comes from the muzzle of a gun that has been fired. It consists primarily of gunpowder that is burned, gunpowder that is burning, and gunpowder that is not burned, and it also includes fragments of any metal that may come from abraiding or rubbing the muzzle of the barrel of the gun. And it also includes scrappings from the missile that comes out, usually a bullet; that is gunshot residue.
“Q. And it’s your testimony that you found none of this material on the outside or surrounding the entrance of the wound in the shoulder?
“A. That’s correct.
“Q. All right, sir. Would you describe— go ahead and describe in detail any other observations that you made concerning the shoulder wound?
“A. The inside of the wound was the area in which the gunshot residue had been deposited. The inner aspect of the wound was blackened with soot, and contained gunpowder particles that were burned, and those that were unburned. In addition, the third feature of the wound was a jagged edge to the edges— excuse me, jagged edges of the wound; this results from the blow back of the gasses as they hit the bone and blew back and tore the edges of the wound.
“Q. Based on your examination of the wound, Doctor, that we are talking about in the shoulder, and also based on your experience and training, were you able to come to a conclusion or opinion as to how this wound was inflicted?
“A. Yes, sir.
“MR. ROGERS: Judge, now, we are going to object. He has to do with autopsies. I believe that Mr. Brett Wheeler is an expert in the field that they are not [sic, which we assume is meant for “now.”] trying to qualify this gentleman in.
“MR. LITTRELL: Judge, we are talking about a wound to the body, which he examined.
“THE COURT: Well, again, I will sustain it as to the form of the question. You can ask him if he has an opinion as to the distance the end of the gun barrel was from the body.
“MR. LITTRELL: Very well.
“BY MR. LITTRELL:
“Q. Doctor, do you have an opinion as to the distance of the gun barrel from the shoulder at the time the gun was fired and the wound inflicted?
“A. I do.
*1260 “MR. ROGERS: We are going to object on the basis that this man is not qualified to answer this question.
“THE COURT: Overruled.
“MR. ROGERS: We take exception.
“A. Ido.
“Q. What was that, please, sir?
“A. Close contact, no distance that could be measured.
“Q. All right, sir. Close contact. No distance that could be measured. Is that your answer?
“A. That is my answer.
“MR. ROGERS: We object, Your Honor, him repeating it and going over it. We take an exception and ask that the Court instruct the jury not to—
“THE COURT: Well, just let the witness answer, Mr. Littrell, and the jury, everyone of them can hear.
“MR. LITTRELL: All right.”
Appellee takes the position in its brief that “There was no timely objection to the testimony that there was a contact wound on the victim’s body” and that “an objection to evidence must be made when that evidence is offered,” citing Beckley v. State, 353 So.2d 542 (Ala.Cr.App.1977). In support of its position, appellee also cites Oatsvall v. State, 57 Ala.App. 240, 327 So.2d 735, 738 (1975), cert. denied, 295 Ala. 414, 327 So.2d 740 (1976). In a reply brief, counsel for appellant seeks to distinguish the instant case from Beckley and Oatsvall. Our review of the evidence convinces us that whether or not the instant case is distinguishable from the cited cases, no reversible error occurred as to the matter, for the reason that any ruling in connection therewith adverse to defendant was innocuous. As the testimony of Dr. Santeno had made it clear before any objection was made by defendant that the shoulder wound was a contact wound and that a contact wound consists of an injury sustained with the muzzle of a gun pressed against the target, the jury already had for its consideration substantially the same evidence found in his subsequent testimony that as to such wound there was, “no distance that could be measured” between the gun barrel and the shoulder at the time the gun was fired and the shoulder injured. To rule otherwise would be inconsonant with Rule 45, Rules of Appellate Procedure. Hall v. State, 248 Ala. 33, 26 So.2d 566 (1946); Wade v. State, 349 So.2d 141 (Ala.Cr.App.1977); Allen v. State, 390 So.2d 676 (Ala.Cr.App.1980). Moreover, although we do not condone the needless repetition of substantially the same evidence, the transcript does not show an objection to the specific question to which Dr. Santeno answered: “Close contact, no distance that could be measured.” It is regrettable that even after this answer was given, repetitious questioning continued, to which defendant properly objected, and the court put an end to such interrogation.
Appellant asserts that the trial court erred in refusing the following charges requested by defendant:
“D27 I charge you the Jury that if you find from all the evidence that Rayburn Vess at the time of the shooting was a criminal trespasser on the premises of Dee Hill and you further find from all the evidence that Dee Hill reasonably believed that Rayburn Vess was about to commit an unlawful deadly physical attack on Dee Hill, then, you can not convict the defendant.”
“D30 I charge you the Jury that if you find from all of the evidence that Dee Hill on the 31st day of May, 1980, told Rayburn Vess not to come back on his property and you further find from the evidence that Rayburn Vess in a matter of minutes left Dee Hill’s property and then returned to the property of Dee Hill, then you must consider Rayburn Vess a criminal trespasser on the property of Dee Hill.
“D44 I charge you the Jury that if you believe from all the evidence that Rayburn Vess was a trespasser and that Dee Hill at the time the fatal shots were fired was within the curtilage of his dwelling house, then, I charge you the Jury that Dee Hill had no obligation to retreat from the curtilage of his dwelling house to avoid shooting Rayburn Vess.”
*1261 Appellant also urges that his requested charge D31 was erroneously refused, but as he concedes that it is substantially the same as and no better than D27, our treatment of D27 would seem to suffice.
The requested charges seek to invoke for the benefit of defendant § 13A-7-4 of the relatively new Criminal Code of Alabama, which provides:
“(a) A person is guilty of criminal trespass in the third degree when he knowingly enters or remains unlawfully in or upon premises.
“(b) Criminal trespass in the third degree is a violation.”
We think that the charges were at least misleading and, for that reason, were properly refused in that to constitute a criminal trespass one must “knowingly enter or remain” in or on the property of another. In this particular case, in view of the close question as to whether Mr. Yess was on property of the defendant, there is little basis, if any, for an inference that he was “knowingly” on defendant’s property at the time he was shot by defendant. To have properly invoked the benefit of § 13A-7-4 by his requested charges, defendant should have hypothesized them on knowledge by Mr. Vess that he was on defendant’s property. For additional reasons, each charge was properly refused, as we now endeavor to show.
Charge D27 ignored an essential element of a valid defense of self-defense, whether on defendant’s property or not, that is, defendant’s freedom from fault in bringing on the difficulty. Cauley v. State, 33 Ala.App. 557, 36 So.2d 347 (1948), cert. denied, 251 Ala. 163, 36 So.2d 354; Sanford v. State, 2 Ala.App. 81, 57 So. 134, 138 (1911).
Even if Charge D30 were hypothesized on knowledge by Vess that he was on the property of defendant, the charge would remain abstract.
Charge D44 was substantially covered by the following portion of the court’s oral charge:
“If you found as a matter of evidence that he [defendant] was within the curti-lage or within the realm of his home or where he works, then on the question of self defense, you would not have to find that he would have to retreat, because the law is you don’t have to retreat, if you are in your work place or if you are within your home or within the curtilage of your home; that element of self defense would be found to be there on the evidentiary finding that where he was was his home.”
Even though there is no conflict in the evidence as to what occurred between defendant and the victim a few moments before the homicide, a jury question was presented as to whether defendant acted in self-defense. As stated by Judge Bowen in Mack v. State, Ala.Cr.App., 348 So.2d 524, 529 (1977):
“When the issue is present, the state must prove that the accused did not act in self-defense in the sense that the state must prove a prima facie case of unjustified homicide. However, even if the evidence of self defense is undisputed, the credibility of the defendant with respect to the evidence of self-defense is for the jury, and they may, in their discretion, accept it as true or reject it. Washington v. State, Ala.Cr.App., 339 So.2d 611, cert. denied, Ala., 339 So.2d 616 (1976); Moore v. State, 54 Ala.App. 22, 304 So.2d 263, cert. denied, 293 Ala. 768, 304 So.2d 268 (1974).”
We find no error in the record prejudicial to defendant. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge Leigh M. Clark, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment of the trial court is hereby
AFFIRMED.
All the Judges concur.