LEIGH M. CLARK, Retired Circuit Judge.
This is an appeal from a judgment of conviction and sentence in a trial on an indictment charging the defendant-appellant with having “intentionally” caused “the death of another person, Soal Haynes, by shooting him with a pistol, in violation of § 13A-6-2 of the Code of Alabama.” At a duly conducted sentencing hearing after the State had given timely notice to defendant of its intention to proceed against him pursuant to the Habitual Felony Offender Act and proof being made at the sentencing hearing that the defendant had been previously convicted of three or more felonies, the Court sentenced him to imprisonment for life without parole. The indigence of defendant having been shown to the satisfaction of the trial court, an attorney was appointed for him, who represented him throughout the proceedings of the trial court and continues to represent him by a brief in which two issues are presented. The first issue is captioned as follows:
“WHETHER THE STATE FAILED TO PROVE A PRIMA FACIE CASE OF MURDER BECAUSE:
(A) THE KILLING WAS PROVOKED BY THE DECEASED;
(B) THE APPELLANT WAS NOT GUILTY BY REASON OF SELF DEFENSE?”
The victim of the homicide was the husband of defendant’s sister, with whom the victim had engaged in a quarrel at the home of the married couple; the widow testified as to the death of her husband, which occurred on July 24,1983. We quote from her testimony, as a witness for the State, as follows:
“Q. What if anything unusual happened on that day?
“A. Well, my husband came home; he had been drinking. And he went into the house and we got into an argument. We started fighting. He hit me in the head with a pistol, and I was bleeding and I asked him and told him to let me call the paramedics so that I could get something done for myself. Then he pushed me back up against the wall. He left out of the house and went on the outside. And—
[[Image here]]
“Q. Just answer the questions. At that time when you got outside, what happened? What did you observe?
“A. When I got outside?
“Q. Yes.
“A. I was in the house.
“Q. Okay. And what did you do after that?
“A. My daughter was wiping my head. She was wiping some of the blood out of my head. And I walked out into the living room.
“Q. What did you observe in the living room area?
“A. My brother and my husband were standing face to face, seemed to be talking or arguing. But anyway, I heard a shot. My husband ran—
“Q. Now, excuse me. You say you heard a shot. Did you see it?
“A. Yes.
“Q. Okay. Can you tell me what happened then?
“A. Then my husband grabbed his stomach and he said, man you done shot me. And he ran toward the — out the—
“Q. What happened next? What did Mr. Bean do that time, if anything?
“A. He was still standing beside the car.
“Q. What happened?
“A. Well, he fired two more shots.
“Q. Okay. You say he fired two more shots. What kind of time frame are we talking about? Fast or—
“A. Fast.
“Q. Where did he shoot Mr. Haynes? I mean, what part of his body?
“A. The only one that I know of was when he hit him in the stomach, lower part of his stomach. The other bullets, where they hit, I don’t know.
*649 “Q. Okay. At this time, you say there was a total of three shots; is that right?
“A. Well, that’s all I know of.
“Q. All right. Now, did you hear any conversation between Mr. Bean and Mr. Haynes at that time?
“A." .Yes.
“Q. Did you hear any conversation?
“A. Yes.
“Q. What was the nature of that conversation?
“A. My brother told him that he had sat back and he had watched and he had took all he could take of him beating me.
“Q. What happened then?
“A. That’s when the shooting occurred.
“Q. Okay. Now, did Mr. Bean do anything after the shooting? Did anybody try to stop him, in other words?
“A. I hollered to him, yes.
“Q. What happened?
“A. He left.”
One of the witnesses for the defendant was the daughter of his sister and her husband, the victim, who testified that, before the encounter between defendant and the victim, the mother and the father of the witness were fussing out in the yard, and the following occurred:
“Q. And then as your mother walked on in the house, your father got up, and did he say, bitch, don’t you know I’ll kill you?
“A. Yes, sir.
“Q. Now, is it your testimony that they fought in the yard? Did they fight in the yard before they went in the house?
“A. No, sir.
“Q. What happened after they went in the house?
“A. I don’t know; I was still standing outside. I just heard a lot of talking and arguing. And I guess my mama, she went in the bathroom. We had a bathroom in the hallway and one in my mother’s bedroom. And she went in the one in her bedroom. And when she was coming out, he [her father] was standing up on the bed. And he jumped down and hit her in the head with the pistol. And she was bleeding, and she was walking around. I heard her walking around hollering to ask my uncle [the defendant] to help her. And he was saying he ain’t having nothing to do with it.
“Q. And what happened after that?
“A. After he said he ain’t having nothing to do with it, my daddy said, Law can’t help your G- damn a- and he was fussing and talking about my uncle wasn’t going to do nothing to him, too. And so my mama, she just kept on hollering to take him away, take him away from there.
“Q. What did your father do at that time?
“A. He ain’t done nothing he just — he went outside then. That’s when he picked up this pipe.
“Q. What did he do after he picked up the pipe?
“A. And then my mama was telling him, hollering, talking about she had to go to the hospital. So he threw the pipe down. And he had his shirt — he had it laying on the chair by the tree. And he went out there to put his shirt back on. And when he was headed back in my house, my uncle, I guess he thought he was fixing to mess with mama again when he was going in the house. And so my uncle came out the door and pushed him back and told him, Law, [sic] don’t mess with her no more. And then that’s when he had shot him. And then my daddy opened his shirt up, because he shot him in the stomach, and daddy opened his shirt up and said, man, you done shot me, like that. And that’s when I hollered, don’t shoot him no more. And my daddy was going in his pocket at his pistol. And I guess my uncle knew [if] my daddy would have got his pistol out he would have killed him, and so that’s when [sic] he kept on shooting. And so my daddy was running toward the tree hollering please don’t shoot me no more. And then he fell and my uncle turned him over and got his pistol out of his pocket and was finishing — I guess was fixing to shoot him with his pistol, and *650 that’s when my mama pushed him and told him to go ahead on. And that’s when my uncle left and my mama started hollering, call the paramedics or somebody.”
It is to be noted that the trial judge in an oral charge to the jury instructed the jury fully as to the averments of the indictment, particularly the adverb “intentionally,” as well as to the issue of self-defense, making it clear that defendant would not be guilty of murder if the homicide was not intentionally committed or, if it had been committed intentionally, that defendant at the time “reasonably believed that the victim was about to assault him [the defendant] with a weapon, or about to assault his sister with a weapon. The law, of course, being that a person may act in either self defense of himself or in self-defense of another person in this case.”
Appellant’s counsel’s only issue is as to the verdict and judgment finding and adjudging this appellant guilty of murder, which issue is divided into two parts; one is that the “State failed to prove a prima facie case of murder” because the appellant was not guilty by reason of self-defense. Appellant is not correct in this contention, by reason of what was stated in Mack v. State, 348 So.2d 524, 529 (Ala.Cr.App.1977), as follows:
“When the issue [of self-defense] is present, the State must prove that the accused did not act in self-defense in the sense that the State must prove a prima facie case of unjustified homicide. However even if the evidence of self-defense is undisputed, the credibility. of the defendant with respect to the evidence of self-defense is for the jury, and they may, in their discretion, accept it as true or reject it. Washington v. State, Ala.Cr.App., 339 So.2d 611, cert. denied, Ala., 339 So.2d 616 (1976); Moore v. State, 54 Ala.App. 222, 304 So.2d 263, cert. denied, 293 Ala. 768, 304 So.2d 268 (1974).”
By the other of the two parts of the first issue presented by appellant, his counsel relies upon the next to the last sub-section of § 13A-6-2, Alabama Criminal Code, defining murder, which states:
“(b) A person does not commit murder under subdivisions (a)(1) or (a)(2) of this section if he was moved to act by a sudden heat of passion caused by provocation recognized by law, and before there has been a reasonable time for the passion to cool and for reason to reassert itself. The burden of injecting the issue of killing under legal provocation is on the defendant, but this does not shift the burden of proof. This subsection does not apply to a prosecution for, or preclude a conviction of, manslaughter or other crime.”
The trial court submitted to the jury for its decision the question whether the defendant “was moved to act by a sudden heat of passion caused by provocation recognized by law, and before there had been a reasonable time for the passion to cool and for reason to reassert itself.” We think there is much to be said in favor of appellant’s position as to whether the provocation, particularly the provocation caused by the victim’s treatment of defendant’s sister, served to prevent the particular homicide from constituting murder, but we have no doubt that this was not a question for the court to decide, but for the jury and that the particular point was properly submitted to the jury for its determination.
The only other issue in brief of counsel for appellant is thus captioned:
“WHETHER APPELLANT WAS PROPERLY SENTENCED AS A HABITUAL OFFENDER?”
As to this purported issue, the only statement made in brief of counsel for appellant is the following:
“The appellant requested that the above issue be raised. As far as this attorney understands his request, he contends that the legislature did not intend for the habitual offender role to apply to the offense of murder. Appellant’s counsel has been unable to find any arguable *651 reason to support this contention, but raises this issue for consideration by the court or for the court to allow appellant to address this issue himself.”
We determine this issue adversely to appellant.
In our opinion, the judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.